# Case No. 12,513.

## The SCOTIA.

17 Blatchf. 308; 1 3 Chi. Leg. News, 10; 3 Am. Law Rev. 582; 5 Am. Law Rev. 382; 2 Am. Law Times Rep. U. S. Cts. 60.]

Circuit Court, S. D. New York. · June 11, 1870.[2]

COLLISION—STEAM AND SAIL VESSELS—CONSTRUCTION OF RULE AS TO RIGHT OF WAY—LIGHTS —RULES OF NAVIGATION.

1. The rule that, when a steamer and a sailing vessel are approaching each other, so as to involve danger of collision, it is the duty of the steamer to keep out of the way of the sailing vessel, and that the mere fact of collision is prima facie evidence of fault in the steamer, is not so unyielding that it may not be shown that the steamer exercised due care.

2. If a steamer, on seeing a light at sea on another vessel, observes it diligently, and has no reasonable ground to apprehend a collision, it is not incumbent on her to slacken her speed or change her course.

[Cited in The Free State. Case No. 5,090; The Sunnyside, Id. 13,620; The Manitoba, Id. 9,029.]

3. A steamer, in this case. held not to have been in fault in porting her helm at the same time that she slowed, stopped and reversed, on seeing danger of collision with another vessel at night at sea, she having reasonable ground, induced by the light shown by such other vessel, to suppose that such other vessel was a steamer.

[Cited in The Free State. Case No. 5,090; The Sunnyside, Id. 13,620.]

4. Where a sailing vessel did not carry the lights required by the statute of the United States, but carried a white light, which, seen by a steamer, induced the steamer to believe that the sailing vessel was a steamer whose side lights had not yet come into view, and the steamer made such movements as were proper for her to make if meeting another steamer, and a collision ensued between the two vessels, held, that the steamer was not in fault; that the sailing vessel was wholly in fault; and that the sailing vessel could not recover against the steamer for the damage caused by the collision.

[Cited in The Continental. Case No. 3,141; The Free State. Id. 5,090; Leonard v. Whitwill, Id. 8,261.]

5. The binding force of the rules of navigation prescribed by the acts of congress, upon vessels of the United States, considered.

6. Where the neglect of a vessel of the United States to carry the lights required by those rules was the cause of her loss. through a collision between her and a foreign steamer, on the high seas, her owner cannot recover for such loss, against such steamer.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel filed in the district court by the owners of the American ship Berkshire against the British steamer Scotia, to recover the sum of $55,000 as the value of the Berkshire and her pending freight. and the sum of $340,000 as the value of a cargo

of cotton under carriage by her, the Berkshire and her cargo having been sunk and totally lost by a collision which occurred between the two vessels, in the Atlantic Ocean, at about two o'clock on the morning of the 11th of April, 1867. The Berkshire was on a voyage from New Orleans to Havre in France, and the Scotia was on a voyage from Liverpool to New York. The district court dismissed the libel and the claimants appealed to this court.

The opinion of the district court (Blatchford, District Judge), was as follows:

"This case is an important one, from the large amount involved, and the gravity of some of the legal questions discussed, and was argued by the learned counsel for the respective parties, with a zeal and an ability commensurate with its demands; but I think it will not be found difficult to arrive at the proper solution of the controversy The libel alleges that the Berkshire, while sailing with the wind somewhat free, on a course south east by east half east. under full sail and making about seven miles an hour, discovered a white light on her port bow from four to five miles distant; that the light seemed to come directly towards the Berkshire, and was thought to be the light of a sailing vessel, as no other light than a white light could be made out; that the master of the Berkshire, fearing a collision, ordered his helm to be put to starboard, and the vessel to be kept away; that, on this being done, the light was brought over the starboard bow of the Berkshire; that, shortly after this, the approaching vessel was discovered to be a steamer; that at that time the lights on board of the Berkshire were burning brightly, and were plainly seen on board of the Scotia; that the Scotia came on at full speed and struck the Berkshire about opposite the forechains, with a blow glancing a little forward, cutting off her bow. and carrying away her foremast with all her forerigging; that the Scotia had ample time to avoid the Berkshire, but put her helm to port. knowing that the Berkshire had the wind free, and attempted to cross the bows of the Berkshire, and followed her up until the collision took place; and that, by the collision, the Berkshire and her cargo were totally lost.

"The answer alleges, that when the lights of the Scotia were discovered by the Berkshire. the course of the Berkshire was very much to the south of east, and more southerly than southeast by east half east; that, at the time of the collision. the Berkshire had only a bright light, which was fastened to her anchor stock; that she was violating, in respect to lights. the laws of both England and America; that the Scotia had all proper lookouts properly stationed, and had her proper regulation white. green, and red lights; that. as the Scotia was steering west by north half north. making about thirteen knots an hour, her lookout discovered and

1 [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]
2 [Affirmed in 14 Wall. (81 U. S.) 170.]

reported a bright light on her port bow; that the light then appeared to be about five miles off; that the steamer's helm was at once ported, and the light kept receding gradually from the Scotia's bow until very shortly before the collision, when it began to close in; that thereupon the engines of the Scotia were stopped and reversed and her headway stopped; that, when the two vessels first became visible from each other, their courses were divergent, the Scotia's being north of west, and the Berkshire's considerably south of east, and each bearing off the port bow of the other; that, if the Berkshire had kept her course, no collision would have happened, even if the Scotia had not ported; that the red and white lights of the Scotia were seen by the Berkshire, and her helm was put to port, and she came around towards the south, so as to be at times in the wind; that, some time after that, her helm was put hard a starboard, and her course was suddenly changed to the northward, and she fell off rapidly before the wind and got before the course of the Scotia; that, by reason of the Berkshire's not having the colored lights required by the laws and customs of both England and the United States, it was impossible for the Scotia to discover the changes in her course; and that the collision was caused entirely by the want of proper lights, and the mismanagement and want of care, on the part of those in charge of the Berkshire. This answer is sworn to by Mr. Sowerby, the chief officer of the Scotia, who states, in the jurat to the answer, that he was in charge of the Scotia, as officer of the deck, at the time of the collision. All of the allegations above recited from the answer, except the one as to the course of the Berkshire when she discovered the lights of the Scotia, are sworn to in the jurat, by Mr. Sowerby, to be true of his own knowledge.

"The general laws of navigation, as respects two vessels, where one of them is a steamer and the other is a sailing vessel, and entirely irrespective of any statutory regulations, are held by the supreme court of the United States to be, that when a steamer is meeting a sailing vessel, whether the sailing vessel is close-hauled or has the wind free, the sailing vessel has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her; that when a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precaution to avoid a collision; that if this be not done, prima facie the steamer is chargeable with fault; and that her excuse, to exempt her, must be clearly established by strong circumstances. St. John v. Paine, 10 How. [51 U. S.] 557, 583; The Oregon v. Rocca, 18 How. [59 U. S.] 570. The duty thus imposed upon a steamer is the same, in character and extent, with that now prescribed by statute regulation, in both Great Britain and the United States. By article 15 of the 'Steering and Sailing Rules,' in the act of congress approved April 29, 1864 (13 Stat. 60), and article 15 of the 'Regulations for Preventing Collisions at Sea,' which went into effect June 1, 1863, prescribed by an order in council, made January 9, 1863, by virtue of the merchant shipping amendment act of Great Britain, of July 29, 1862 (25 & 26 Vict. c. 63), it is provided as follows: 'If two ships, one of which is a sailing ship, and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship.'

"What, then, is the excuse set up by the Scotia, in her answer, for colliding with the Berkshire? The substance of it is, that the Berkshire showed only a white light, and no colored light; that the Berkshire saw the colored lights of the Scotia, and first put her helm to port, and some time after suddenly changed her course by putting her helm to starboard, and running before the wind and across the course of the Scotia; that these manœuvres of the Berkshire were, however, not discovered by the Scotia, because the Berkshire did not have colored lights; that the Berkshire's light was discovered on the port bow of the Scotia, and the Scotia's helm was at once ported, and the Berkshire's light kept receding gradually from the Scotia's bow, until very shortly before the collision, when it began to close in; and that the engines of the Scotia were thereupon stopped and reversed. I am satisfied, from the evidence, that the statement in the answer is true, that any changes in the course of the Berkshire which were made were not discovered by the Scotia; that the light of the Berkshire was not seen by the Scotia until after the Berkshire had starboarded her helm and was running to the northward before the wind; that the receding of the Berkshire's light from the Scotia's bow, which took place, as the answer states, after the Scotia's helm was ported, was caused by such porting of the Scotia's helm and by the consequent movement of the Scotia's bow to the northward; and that the closing in of the Berkshire's light very shortly before the collision, was caused by the forward progress of the Berkshire on the same course on which she was running at the time her light was discovered by the Scotia. So far, therefore, as the movements of the Scotia, consequent upon her discovery of the light of the Berkshire, are concerned, any change of course by the Berkshire before the discovery of such light by the Scotia, is of no consequence. The case stands as if the Berkshire had never made any such change. What, then, did the Scotia do when she discovered this white light on her port bow? Without having anything whereby to determine which way the vessel carrying such light was heading, seeing no colored light, not waiting to see whether it

would not be more prudent to starboard than to port her helm, or more prudent to neither starboard nor port, but to stop and reverse her engines, she straightway ported her helm, but she still kept up her full speed of thirteen knots an hour, and it was not until the light which she had shaken off a little in appearance, but none in reality, by porting, began to close in, as the vessel which bore it moved forward, that the Scotia stopped and reversed her engines. I state the case as the answer states it. Of this the Scotia cannot complain; and the statement is as favorable to the Berkshire as anything warranted by the evidence.

"It is claimed, however, that the Scotia was not in fault, and that the Berkshire was wholly in fault, because the Berkshire, by carrying a white light, and which was a globe lantern, low down on her anchor-stock, induced the belief on the Scotia that the Berkshire was a steamer some five miles off, instead of a sailing vessel nearer at hand, and that the Scotia, thus making such a light on her port bow, was justified in believing that it was the light of a steamer and in porting her helm. This claim, on the part of the Scotia, is based on the proposition, that, as the Berkshire was a vessel belonging to the mercantile marine of the United States, and under way, she was forbidden, by the act of April 29, 1864, to carry the white light which she did carry, and was bound to carry the green and red lights which she did not carry. The British requirements as to lights, contained in the regulations before mentioned, are the same as those of the act of congress. That act prescribes the regulations for 'the navy and the mercantile marine of the United States.' The British regulations, as originally promulgated, 'apply to all ships, whatever their nationality, within the limits of British jurisdiction, and to British and French ships, whether within British jurisdiction, or not.' Order of the British Board of Trade, January, 1863, Macl. Supp. 81. The position of fact taken for the Scotia is, that the white light of the Berkshire was supposed to be the masthead light of a steamer at a considerable distance, and near the horizon, and, therefore, small in appearance, and that the steamer carrying such light was supposed to be so far off that her colored lights, much lower down and not visible as far off as the white light, had not yet come in view.

"The libellants, while they admit that the Berkshire did not carry the colored lights prescribed by the act of congress, and did carry and exhibit the white light referred to, insist that the Scotia cannot avail herself of a municipal statute of the United States to convict an American vessel of a tort committed on the high seas; that the questions in controversy must be determined without reference to the municipal laws of either the United States or Great Britain, and solely according to the general maritime law; that the regulations adopted by the two governments several-

ly for the guidance of their respective vessels, cannot bind a vessel of either nation as against a vessel of the other nation, until such regulations are mutually adopted as international, and placed beyond the power of being changed by either nation without the consent of the other; and that, by the general maritime law, there was no obligation on the Berkshire to exhibit any side colored lights.

"In the case of The Dumfries, 1 Swab. 63, decided in 1856, the owners of a Danish vessel sued a British vessel to recover for a total loss occasioned by a collision between the two vessels on the high seas. In giving judgment in the case, Dr. Lushington says: 'This being a collision on the high seas, between a foreign and a British vessel, it appears to me that we cannot apply the act of parliament, but that the case must be governed entirely by ordinary nautical rules.' The point raised against the British vessel under the act was, that she did not carry the statute lights. The act was held not to apply to the British vessel, but she was condemned under the general law of the sea, for not having ported her helm soon enough.

"In the case of The Zollverein, 1 Swab. 96, decided in 1856, the Pet, a British brig, collided on the high seas with the Zollverein, a Prussian brig. The Pet brought suit in the British court. The Pet was sailing closehauled on her port tack. The Zollverein was running before the wind, and came in collision, stem on, with the port bow of the Pet. The Pet had kept her course. The Zollverein was held to have been in fault in not having soon enough ported her helm. It was also held, that the collision might have been avoided if the helm of the Pet had been ported, for which there was ample time; that, by the British act, the Pet was required to port; that, but for that act, the Pet would have been justified in keeping her course and in not porting; and that no circumstances were shown to render a departure from the rule laid down in the act necessary, to avoid immediate danger. As the Zollverein was found in fault, the question was, therefore, distinctly raised, whether the Pet was in fault for not obeying the British act. One section of that act provided, that if, in any case of collision, it should appear to the court before which the case was tried, that such collision was occasioned by the non-observance of any rule of navigation prescribed by the act, the owner of the ship by which such rule had been infringed should not be entitled to recover any recompense whatever for any damage sustained by such ship in such collision, unless it should be shown, to the satisfaction of the court, that the circumstances of the case made a departure from the rule necessary. On the part of the Zollverein it was contended, that whatever might be her liability, the Pet was precluded from recovering, because of her violation of the British act. Dr. Lushington, in giving his judgment, said that he had given frequent and deliberate con-

sideration to the point, whether the British act could affect a British vessel which had been in collision with a foreign vessel on the high seas, the former being the party proceeding in the suit. He then proceeds: 'Generally, when a collision takes place between a British and a foreign vessel on the high seas, what law shall a court of admiralty follow? As regards the foreign ship, for her owner cannot be supposed to know or to be bound by the municipal law of this country, the case must be decided by the law maritime, by those rules of navigation which usually prevail among nations navigating the seas where the collision takes place.' He further holds, that the legislature has no power to determine how foreign vessels shall conduct themselves at the time of collision on the high seas, and that such conduct involves the rights and merits of the case. He then adds: 'Then comes the question, whether, in a trial of the merits of a collision, a foreigner may urge, in his defence, that the British vessel, though free by the law maritime, has violated her own municipal law, and so, being plaintiff, cannot recover? Reverse the position: suppose the foreigner plaintiff and to have done his duty by the law maritime. I am clear that he must recover for the damage done; if so, it is contrary to equity to say that the British ship-owner, in eadem conditione, shall not recover against the foreigner. What right can the foreigner have to put forward the British statute law, to which he is not amenable, so far as the merits are concerned?' The court pronounced for the damage proceeded for by the Pet against the Zollverein.

"In the case of Cope v. Doherty, 4 Kay & J. 367, 389, 390, decided in 1858, Sir W. Page Wood, then a vice chancellor, and now lord chancellor of England, cites with approbation the views, before referred to, held by Dr. Lushington, in the case of The Zollverein. He says that it is 'proper for every court of judicature, in construing the enactments of any legislature, to presume, prima facie, and unless the contrary be expressed, or be implied from the absolute necessity of the case, that such legislature intended, by its enactments, to regulate the rights which should subsist between its own subjects, and not in any way to affect the rights of foreigners, whether by way of restricting or augmenting their natural rights. In construing our own statutes, no other rule can be a sound rule to adopt, unless it be clear, from the absolute necessity of the case, that the legislature intended to affect the rights of foreigners.' The question involved in that case was, whether the limitation of liability provided for a ship-owner by the British act of 1854, where damage was occasioned by his ship to another ship, operated in favor of a foreign ship-owner sued in a British court. The vice chancellor held, that the limitation provided for did not relate to the form of judicial procedure, but to the substance of the controversy; that the lex fori was not applicable to the case; and

that there was nothing in the British act to show that the legislature intended, by the provision as to limitation of liability, either to restrict or to enlarge the rights of any foreigners in respect to matters occurring out of its jurisdiction, even in a question between a foreigner and a British subject, still less in a question between two foreigners. The case was appealed, and the decision of the vice chancellor was affirmed. Lord Justice Turner, in his judgment (Cope v. Doherty, 2 De Gex & J. 614, 624), says: 'Was it, then, the intention of the legislature, that the general words contained in the sections to which I have referred should extend to the case of a collision between foreign ships owned by foreigners? I think it was not. This is a British act of parliament, and it is not, I think, to be presumed, that the British parliament could intend to legislate as to the rights and liabilities of foreigners.'

"In the case of The Saxonia, 1 Lush. 410, decided by the high court of admiralty, in 1861, and by the privy council, on appeal, in 1862, the Eclipse, a British barque, collided with the Saxonia, a Hamburg steamer, on the high seas. The green light of the Eclipse, was either extinguished, or so dimly burning as not to conform to the British regulation. The Eclipse, being closehauled on her port tack, sighted the Saxonia's lights three miles off, broad on her starboard bow, and they continued to approach her starboard side, until, shortly before the collision, a flare-up light was exhibited by the Eclipse on her starboard quarter, and her helm was starboarded. The Saxonia did not observe the green light of the Eclipse, and only observed the vessel herself right ahead, shortly before the exhibition of the flare-up light, and the Saxonia then, or after seeing the flare light, ported her helm, without slackening her speed. Both vessels were damaged and an action and a cross action were brought. It was contended, for the Saxonia, that, under the British act of 1854, the Eclipse could not recover, as she was in fault for not observing the statute in regard to lights. Dr. Lushington in giving judgment, says: 'When a British and foreign ship meet on the high seas, the usual rule is that the statute is not binding. Clearly, it is not binding on the foreigner; and, if it were considered binding on the British vessel, the British vessel would manifestly be under an undue disadvantage. I believe the practice of applying the maritime law to such cases has been followed universally up to the present moment, and I hold such to be the law.' The court held that the case must be decided by the ordinary rules of the sea, and that both vessels were to blame for the collision—the Eclipse for having improperly starboarded her helm, and the Saxonia for not having slowed her engines, when she was not able to discover what the other vessel was—and made a decree dividing the damages in each case. Both parties ap-

pealed to the privy council. It was there contended, for the Saxonia, that, under the British statute, the Eclipse could not recover anything, because she had violated that statute, in not carrying a sufficient green light, and in starboarding her helm. The privy council held that, as the collision took place on the high seas, in a place where a foreign vessel had a right of sailing without being bound by any of the provisions of the statutes enacted to govern British ships, it followed that the British act had no application to the case. The master of the rolls, who delivered the judgment of the privy council, adds: 'It has been fully determined, that where a British and a foreign ship meet on the high seas, the statute is not binding on either. The principle, therefore, by which this case must be decided, must be found in the ordinary rules of the sea.' The privy council held the Eclipse in fault for not showing a light in sufficient time to enable the Saxonia to avoid the collision, and the Saxonia in fault for continuing at full speed and not easing and stopping her engines when not able to discover what the Eclipse was doing, and affirmed the decree of the court below.

"The same doctrine was laid down in a case decided in 1861, by the privy council, where an American vessel was sued for a collision by the owners of a British vessel. It was held that the law of the sea must govern and not the British statute, as to the proper rule of navigation. The Chancellor, 4 Law T. (N. S.) 627; Williams v. Gutch, 14 Moore P. C. 202.

"The case of The Cleadon, 1 Lush. 158, 4 Law T. (N. S.) 157, also reported as Stevens v. Gourley, 14 Moore P. C. 92, cannot be regarded as an authority to the contrary. It was decided by the privy council, in December, 1860, the judges being Lord Chelmsford, Lord Kingsdown, and Sir Edward Ryan. It was the case of a collision on the high seas, between the A. H. Stevens, an American ship, and the Cleadon, a British ship, in tow of a steam-tug. The principal action was by the owners of the A. H. Stevens against the Cleadon, and there was a cross-action by the owners of the Cleadon against the A. H. Stevens. The judgment of the court was delivered by Lord Chelmsford. The court held that, as the Cleadon was in tow of the tug, she and the tug must be considered as one vessel, and as a steamer, the motive power being in the tug, and the governing power in the Cleadon. In his opinion, Lord Chelmsford says: 'The A. H. Stevens, being a foreign vessel, was not bound by our regulations, but was governed by the rule of the sea, which required her, being close hauled on the starboard tack, if she was meeting another vessel, to keep her course.' He then says, speaking of the Cleadon and her tug as one vessel and a steamer: 'Under these circumstances, her rule of conduct would be our regulations, be-

cause she would not be aware whether the vessel she was meeting was a foreign or a British vessel, and, at all events, as she was a British vessel navigating, of course she must be governed by the rules that apply to those vessels. It was her duty, being in fact a steamer, to get out of the way of another vessel that she was meeting.' It was held, in the case, that the A. H. Stevens was, by the rule of the sea, in fault, because she ported her helm instead of keeping her course, and that that manœuvre alone caused the collision, the Cleadon and her tug having kept their course. It having been held that the bad management of the A. H. Stevens, the foreign vessel, was, according to the general rule of the sea, the sole cause of the collision, the case really decides no point of law except that, in a collision between a foreign vessel and a British vessel, the former must be judged by the rule of the sea, and not by the British statute regulations. The Cleadon, although, as a steamer, she was said to have been bound by the British regulations to get out of the way of the A. H. Stevens, was held not to have been in fault. The only point in the case open to observation, is the remark of Lord Chelmsford, that the Cleadon, as a British vessel, was, as regarded the American vessel, bound by the British regulations, and that, at all events, as a British vessel navigating, she was bound to observe the British rules. But that remark cannot be regarded as a part of the judgment of the court, for the reasons already stated. If, however, it were to be so regarded, it has been, as a decision, overruled. In the case of The Saxonia, before cited, Lord Kingsdown and Sir Edward Ryan (the two judges who, with Lord Chelmsford, constituted the court in the case of The Cleadon), were two of the four judges who sat and took part in the decision, the other two being the master of the rolls and Sir John T. Coleridge, and, in the judgment of the court, delivered by the master of the rolls in February, 1862, it is said, as before cited: 'It has been fully determined that where a British and foreign ship meet on the high seas, the statute is not binding on either.' The same four judges who sat in the case of The Saxonia, sat in the case of The Chancellor, before cited, where it was held that the Chancellor, being an American vessel, was not bound by the British law. Lord Chelmsford, in the case of The Cleadon, assented to that view. The only point he made was, that a British vessel was, in a collision with a foreign vessel, bound by the British law. But it is quite evident, from the case of The Saxonia, decided subsequently to the case of The Cleadon, that the other two judges who sat with him in the case of The Cleadon, did not concur in that view.

"The principle laid down and applied in the cases of The Dumfries, The Zollverein, The Saxonia, and The Chancellor I regard as a sound one, to be adopted in all cases which

stand on substantially the same facts. That principle is, that, in regard to the rights and merits involved in actions, the law of the place where they originated is to govern. Story, Confl. Law, § 558. In the case of The Zollverein, such law, in respect to collisions on the high seas, called the 'law maritime,' is stated by Dr. Lushington to be 'those rules of navigation which usually prevail among nations navigating the seas where the collision takes place.' This rule is well expressed by Maclachlan in his treatise on the Law of Merchant Shipping (page 268), in this language: 'Between foreigners, or between a British and a foreign ship, when such cases of collision on the high seas are brought into the English court of admiralty, the only rules of navigation that can be appealed to are those usages of the sea generally known and customarily observed by the ships of various nations on the high seas. A foreign vessel, therefore, will not be allowed to set up the British rules, in order to show non-observance of them by a British ship that has been in collision with her, for they are not mutually binding, so as to be available for a British ship against a foreigner.' The same view was held by Judge Shipman, in this court, in the case of The Belle [Case No. 1,269].

"It is claimed, however, on the part of the Scotia, that, as the law of Great Britain, in reference to lights on sea going vessels, is like the statute law of the United States, the latter ought to be enforced here in favor of a British vessel against an American vessel. It is contended, also, that the only reason why ·the courts of Great Britain did not, in the cases cited, enforce the statute law of Great Britain in favor of foreign vessels and against British vessels, in cases of collisions on the high seas, was because, in those cases, it did not appear that the nations to which the foreign vessels belonged had adopted rules like those prescribed by the statute law of Great Britain. The answer put in by the Scotia to the libel rests the question of lights as to the Berkshire wholly on the statute laws of Great Britain and the United States, and not at all on the general rules of navigation. The allegations of the answer are, that the carrying by the Berkshire of a bright light on her anchor stock, and of no other light, was 'in violation of the laws both of England and America,' and that 'the Berkshire had not the red and green lights required by the laws and customs both of England and of the United States.' There is, afterwards, in the answer, a general allegation that the collision was caused entirely by 'the want of proper lights, and the mismanagement and want of care on the part of those in charge of the Berkshire,' but the only test set up in the answer, as to whether the Berkshire had or had not proper lights is as to whether such lights did or did not conform to the laws and customs of England and of the United States. We have already seen, that if the Berkshire were a British vessel suing an American ves-

sel, in the British court of admiralty, for a collision on the high seas, that court would not apply British statute law to the case, unless required by such statute law to do so. Nor would it apply to the case the statute laws of the two countries, even where they were set up and shown to be alike, unless it were required by British statute law to do so. In the case of The Wild Ranger, 1 Lush. 553, 565, Dr. Lushington, in that court, held, that where a British statute was not made applicable to a foreign vessel on the high seas, the court could not apply it to the foreign vessel, when sued by a British vessel, simply because the country of the foreign vessel had enacted a like statute which would apply to a British vessel, under similar circumstances, in a court of such country. It is not stated, in any of the cases in the courts of Great Britain, which I have cited, that the reason for not applying the British statute law was, because the foreign nation had not enacted a like law. The case of The Girolamo, 3 Hagg. Adm. 169, does not establish the principle, that where like statute laws are enacted by two countries, as rules of navigation for their own vessels, respectively, the courts of each of those countries are bound to apply such rules as rules of navigation for the high seas, as between a vessel of the one country and a vessel of the other.

"It is quite certain, however, that if this case were pending in the British court of admiralty, that court would apply to it the rules as to navigation, lights, and fog signals, adopted by statute both by Great Britain and the United States. Those rules, as respects sea going vessels, are, to all intents, identical. The American rules, prescribed by the act of April 29, 1864, went into effect September 1, 1864. The British rules were made under authority of the twenty-fifth section of the merchant shipping amendment act of July 29, 1862, by an order in council, dated January 9, 1863, and published in the London Gazette of January 13, 1863, and went into operation on the 1st of June, 1863. The fifty-eighth section of that act provides, that whenever it is made to appear to her majesty, that the government of any foreign country is willing that the regulations, or any of them, for preventing collision, which shall be for the time being in force under that act, shall apply to the ships of such country when beyond the limits of British jurisdiction, her majesty may, by order in council, direct that such regulations shall apply to the ships of the said foreign country, whether within British jurisdiction or not. The act of congress of April 29, 1864, was regarded, and properly, as an expression, by the government of the United States, of a willingness that the British regulations prescribed by the order in council of January 9, 1863, and which were substantially identical with those contained in that act, should apply to ships of the United States when beyond the limits of British jurisdiction. Her majesty, there-

fore, by an order in council, published August 30, 1864, directed that such regulations should apply to all sea going ships of the United States, whether within British jurisdiction or not, and, by another order in council, published December 2, 1864, directed that such regulations should apply to all ships of the United States, on the inland waters of the United States, whether within British jurisdiction or not. Holt, Rule of Road, p. 2. By like orders in council it appears, that the governments of the following countries, other than the United States, have manifested their willingness that the British regulations of January 9, 1863, should apply to the ships of such countries respectively, when beyond the limits of British jurisdiction; and such orders in council direct that such regulations shall apply to the ships of such countries respectively, whether within British jurisdiction or not. The countries referred to are Austria, the Argentine Republic, Belgium, Brazil, Bremen, Chili, Denmark proper, the Republic of Ecuador, France, Greece, Hamburg, Hanover, the Hawaiian Islands, Hayti, Italy, Lubec, Mecklenburg, Schwerin, Morocco, the Netherlands, Norway, Oldenberg, Peru, Portugal, Prussia, the Roman States, Russia, Schleswig, Spain, Sweden, Turkey, and Uruguay. These orders in council were published at various dates, from January 13, 1863, to February 6, 1866. All the countries named, except Denmark, Greece, the Hawaiian Islands, Schleswig, and the United States, adopted the regulations in 1863. Holt, Rule of Road, p. 2. The law, therefore, as now held in Great Britain, is, that the distinction between foreign and British ships, as regards regulations respecting navigation, lights, and fog signals, is limited to ships of those countries which have not given in their adhesion to the terms of the fifty-eighth section of the British act of July 29, 1862, as respects such regulations, or whose adhesion has not been signified by an order in council. The vessels of all countries which have been declared by an order in council to have given in their adhesion to the British regulations respecting navigation, lights, and fog signals, are treated in all respects, in the courts of Great Britain, like British vessels. Lown. Col. p. 186. This is in pursuance of the sixty-first section of the British act of July 29, 1862, which provides, that whenever an order in council shall be issued, applying any regulation made under that act to the ships of any foreign country, such ships shall, in all cases arising in any British court, be deemed to be subject to such regulation, and shall, for the purpose of such regulation, be treated as if they were British ships. See form of order in council on the subject, 2 Pritch. Adm. Dig. (2d Ed. London, 1865), Append. pp. 281, 282. Accordingly, in the case of a collision which occurred on the high seas, in December, 1865, between the British steamship Samphire and the American barque Fanny Buck, actions having been brought by both vessels, the cross-action being by the Fanny Buck, it was held, in the court of admiralty, that the Fanny Buck was bound by the regulations which had been adopted by the United States respecting lights and courses. Holt, Rule of Road, p. 194. The principle on which that court so held, is shown by the case of The New Ed. v. The Gustow, Holt, Rule of Road, p. 28, where an action and a cross-action were brought for a collision which occurred on the high seas, between a Hamburg brig and a Bremen barque, on the 13th of September, 1863. An order in council, dated July 27, 1863, had declared the British regulations which went into effect June 1, 1863, to be applicable to Bremen and Hamburg vessels. The court refers to this fact and says, that by virtue of the act of parliament and the accession of Bremen and Hamburg, the two vessels were, for the purposes of the suit, to be considered as British vessels, and were to be treated the same as if the collision had taken place between two British vessels. Holt, Rule of Road, p. 28; 9 Law T. (N. S.) 547.

"There is no statute of the United States containing provisions like those found in the fifty-eighth and sixty-first sections of the British act of 1862. The only provision made by congress on the subject by statute, is that found in the act of April 29, 1864, to the effect, that the rules and regulations for preventing collisions on the water, therein contained, shall, from and after September 1, 1864, be adopted in the navy and the mercantile marine of the United States. The merits of the collision in this case must, therefore, be adjudicated according to the rules of navigation and usages of the sea which usually prevailed and were customarily observed at the time and place of the collision, among the ships which navigated the waters where the collision took place. The Fyenoord, 1 Swab. 374, 377. I can have no hesitation in saying what such rules and usages were, when I find them to have been before that time adopted, with such identity, by nearly all the nations whose ships usually navigated the waters where this collision took place, embracing, among others, the United States, Great Britain, France, Spain, Prussia, Russia, Norway, Sweden, Belgium, Bremen, Denmark, Hamburg, Lubec, Hanover, Schleswig, and the Netherlands. I rest my decision on that ground, and not on any municipal statute or statutes, as such, of the United States, or of Great Britain, or of both countries. I have not been referred to, nor have I met with, any case in the United States in which this question is discussed or decided. I must, therefore, resolve it on principle. But I have no hesitation in saying, that the result I have arrived at is very satisfactory, as bearing on the interests of commerce and the safety of human life, in substituting fixed written rules observed by

all the maritime nations, for those which, it is no disparagement to say, were not as definite or certain, or as universally recognized.

"It follows, from these views, that ' the claim, on the part of the Berkshire, that she was allowed to exhibit a white light, and that she was under no obligation to exhibit colored side lights, must be rejected. She had colored side lanterns on board, but they were not in position. The Berkshire was under an obligation, by articles 2, 3, and 5 of the regulations, to exhibit colored side lights, and she was also under an obligation, by the same articles, not to exhibit a white light. The testimony as to the snatching up of a light on board of the Berkshire and putting it into the green lantern, and holding that over the starboard side towards the approaching Scotia, does not vary the case. If exhibited at all, it was not exhibited so as to be seen on board of the Scotia, and it was not seen on board of her. But, if it had been seen, the only inference the Scotia would have been authorized to draw, from seeing a green light added to the white light on the Berkshire, would have been in confirmation of the conclusion warranted by the white light alone, namely, that the Berkshire was a steam vessel within two miles of the Scotia. By the rules, a white light and a colored light indicate a steam vessel, the white light being required to be visible at least five miles off, and the colored light at least two miles off.

"Did the exhibition of a white light on the Berkshire tend to deceive the Scotia? As the white light on a steamer is required to be visible five miles off and the colored light only two miles off, it was natural and proper for the Scotia to believe that the small white light she saw low down near the horizon was a mast-head light of a steamer more than two miles off, whose colored lights were not yet within sight. That those in charge of the Scotia did so believe, I can have no doubt, from the evidence. A pointed circumstance is the one, that rockets were prepared on board of the Scotia, when the white light of the Berkshire was first seen, to signal the approaching vessel, as a steamer, when she should have approached near enough. No such signalling would have been prepared for in respect to a sailing vessel. In reference to the Berkshire as a steamer, it was the duty of the Scotia, by article 13, seeing the light over her port bow, to port her helm, and she had a right to suppose that the Berkshire, as a steamer, would port her helm, as required by that article. Her duty towards the Berkshire as a sailing ship was, under article 15, very different, namely, to keep out of the way of the Berkshire, relying upon a compliance by the Berkshire with the requirement of article 18, to keep her course. The Berkshire having declared, by the language of the sea, to the Scotia, that she was a steamer, cannot be permitted to impute as a fault to the Scotia, the adoption by the latter of the movements which would have been proper if the Berkshire had in fact been a steamer. Under the circumstances, it was proper for the Scotia to port her helm, as she did, at once, on seeing the white light of the Berkshire, and she promptly stopped and reversed her engines the moment that light, by closing in, gave indication that there was danger of a collision. I can discover no fault on the part of the Scotia. The fault on the part of the Berkshire establishes the freedom from fault on the part of the Scotia. If the Berkshire had not been in fault as to her lights,—that is, if the white light she exhibited had been a proper light to be carried by a sailing vessel at the time and place of the collision,—I should have held the Scotia in fault, both in porting before she could clearly see what was the course of the vessel bearing the light, and in not slowing or stopping when she first discovered the light of the Berkshire. But the improper light on the Berkshire made it proper for the Scotia to port, when she did, and not to slow or stop till she did.

"It results, that the claimants will be allowed to amend their answer, so as to set up properly the fact that the Berkshire did not, as to lights, comply with the rules of navigation and usages of the sea which usually prevailed and were customarily observed at the time and place of the collision, among the ships which navigated the waters where the collision took place. Of those rules and usages, as the general law of the sea, the court will take judicial cognizance, without their being proved, as would be necessary in the case of a foreign municipal law or regulation.

"I have not overlooked the case of The Grey Eagle [Case No. 5,735], but I do not think it applies to this case. The principle of that case is a sound one, that the exhibition by a vessel of a prohibited light, does not absolve another vessel from the observance of that degree of caution, care and nautical skill which the exigencies of the case require. I see, in the present case, no want of caution, care or nautical skill on the part of the Scotia.

"When the answer is amended, the libel will be dismissed, with costs."

James C. Carter and Charles Donohue, for libellants.

Erastus C. Benedict and Daniel D. Lord, for claimants.

WOODRUFF, Circuit Judge. Although there is great discrepancy in the testimony of the respective witnesses, on both sides, in regard to many details, and, in some particulars, the testimony in behalf of the libellants is wholly inconsistent with that produced by the claimants, there are some facts in respect to which there is such concurrence of the witnesses that they may safely be tak-

en as established; and, although, in cases of this kind, the estimates of witnesses of the precise bearing of the two vessels at particular moments, and of the precise intervals of time which elapsed between different occurrences, are greatly liable to differ and are often quite unreliable, certain prominent facts in those respects may properly be inferred form a pretty uniform agreement of the whole or of nearly all the witnesses on either side. Some facts may also be gathered by necessary inference from others that are so established. As to some facts the parties themselves do not disagree.

In the present case, I regard it as established, that the course of the Berkshire, the ship of the libellants, was southeast by east half east, she having the wind about two points free, the wind being about south south west, and her speed seven miles an hour; that the course of the steamship Scotia was west by north half north, and her speed thirteen miles an hour; and that the Scotia, when first seen from the Berkshire, bore from one to two points off her port bow. Six witnesses on the Berkshire—every one who was examined to the point—agree in the fact that she bore off the port bow, differing slightly in the degree only; and no one makes the angle less than one point. From these facts it necessarily results, by laws that admit of no question, that the course of the Scotia must intersect that of the Berkshire at some point either ahead of or astern of the latter, or precisely where she then was; and that the two vessels were coming into neighborhood at the combined rate of twenty miles an hour, or one mile in three minutes.

The testimony of the witnesses on board the Berkshire shows, that the white light of the Scotia was seen from fifteen to twenty minutes before the collision; and, although there is not entire uniformity, the balance of their testimony is, that her helm was put to starboard, and she fell off before the wind, not less than ten minutes before the collision; and that, when first seen, the Scotia was from five to six and two-third miles distant, and, when the Berkshire fell off, not less than three and one-third miles distant. As the courses of the respective vessels must cross each other at an angle of one point only, (that being the precise difference between southeast by east half east, and west by north half north), no point on the Scotia's course could bear on any point on the Berkshire's course westwardly of, or beyond, the point of intersection, at an angle so great as one point. It would follow, as a mathematical necessity, that, if the Berkshire saw the Scotia precisely one point off her port bow, the Berkshire was at that precise moment at the point of intersection of the two courses; and, if the larger estimate of the witnesses, one and a half to two points, be taken as true, then it follows, that she had crossed the point of intersection and was to the eastward thereof, entirely out of danger of colli-

sion, before she saw the Scotia. Taking the testimony of her own witnesses, then, captain, mate and seamen, and making just allowance for possible inaccuracy of observation, by a concession from the larger estimate towards the less, the Berkshire had, when the Scotia was seen, passed the point at which the vessels, keeping their courses, could collide; and if, notwithstanding their testimony, it be assumed that the angle of observation was something less than one point, it would only follow that, when she first saw the Scotia, she was very near, though not precisely at, the intersecting point, because, when she was seen off the port bow of the Scotia, she had passed that point and was to the southward of the Scotia's course.

Bearing on the position of the Berkshire when seen from the Scotia, the following appears: She was first seen off the port bow of the Scotia. And here there is the same variation in the testimony as was exhibited in the observations made on the Berkshire. The smallest estimate is one point, the largest two points. But there are seven witnesses, and each testifies unqualifiedly, that he first saw the Berkshire over the port bow, and some of them give circumstances which make the proof to my mind conclusive; and that fact, if proved, establishes what no human testimony can confute, that the Berkshire had then passed, and then was some distance past, the point of the intersection of the two courses, else she could not have been so seen. Not only so; if the lowest estimate, namely, one point on the Scotia's port bow, be taken, then it is perfectly certain that she was at that moment as far to the eastward of the point of intersection as the distance the Scotia then was from her. If the Scotia was then three miles distant, the Berkshire was three miles eastwardly of the point of intersection. If the Scotia was two miles distant, then, when she was first seen, the Berkshire was two miles eastwardly from the point of intersection.

The witnesses from the Scotia, in their estimates of the minutes that elapsed before the collision, and of the distance of the Berkshire when sighted, vary, also, as do the witnesses as to time and distance on the Berkshire. The estimates vary from nine to fifteen minutes; but, in my judgment, the just inference from all of them would not warrant the conclusion that the interval between their discovery of the Berkshire and the collision was so much as ten minutes; and yet, if any reliance is to be placed on the estimates, it must have been very little less. If so, she must have then been three miles distant, and the like distance eastwardly from the point of intersection of the two courses. I am aware that strict mathematical precision cannot, in general, be assumed as the ground of inference from observations which are obviously in some degree imperfect. But we have necessarily to gather the facts from

the testimony. Some reliance must be placed on the estimates of time, bearings and distance; and, upon them, in connection with other facts that are either conceded or established, our conclusions must rest, else it is impossible to reach conclusions at all. When there is general concurrence in facts that bear the test of exact science, the latter strongly corroborates the conclusions drawn from the testimony. The argument is legitimate, and it has, in some form, been applied by counsel on both sides on the argument of the present appeal. And it is of some significance, that the fact last above stated not only harmonizes with the deductions I have above drawn from the testimony of the witnesses from the Berkshire, and shows that, when she first sighted the Scotia, she was out of danger, and to the eastward of the point of intersection of the two courses, but, taken together, the testimony of all the witnesses tends, also, strongly to sustain the conclusion of the district court, that the Berkshire was not seen from the Scotia before the Berkshire had put her helm a-starboard and begun to fall off before the wind. The argument submitted by the appellants deems it probable that they were but three or four miles distant when the Berkshire put her helm a-starboard, at which distance the Berkshire was, as above shown, first seen from the Scotia. The view of the counsel for the Berkshire, therefore, in connection with the reasoning above, makes the time of her falling off almost the same moment, or only very shortly before, she was seen from the Scotia. The question arising upon the facts which I have thus collated is, whether there was fault in the conduct of either, and, if so, of which of the vessels, before or after they respectively sighted each other; for, there is no ground for insisting that either failed to see the other so soon as such other became visible.

First, as to the Berkshire. It is conceded that she carried a white light at her bow, fastened to her anchor stock; and it was fully shown that she carried no other lights. After she had observed the Scotia about ten minutes, and about ten minutes before the collision, her helm was put a-starboard and she fell off before the wind. She was at that time in such a position that, if she had kept her proper course, on which she had been steering, she would have been in no danger, having already passed to the eastward of the point where the Scotia would cross her track. Her mate and the man at the wheel, on seeing the Scotia, had brought the vessel more closely to the wind, which had carried her still further from danger of collision. The master countermanded the order, and made the manœuvre which moved her towards and across the track of the Scotia. Before this was done, and while the Berkshire was, by order of the mate, brought nearer the wind, her wheelsman (according to his testimony) saw the Scotia's red light and her white light.

This, of course, indicated to him, if he knew where it was common for vessels to carry the red light, that the Scotia was a steamer, and that she was heading in a direction which must clear the Berkshire, if the latter kept her course. Riley, the lookout on the Berkshire, who reported the Scotia, first saw her bright light, and heard the order of the master of the Berkshire to keep her luff, and, about ten or fifteen minutes after seeing the bright light, (which was about the time she changed her course, or very soon after,) saw the Scotia's red light; and he imputes the collision to the imprudent change of course when, as he testifies, the Scotia had opened on the port bow of the ship so as to indicate that she would pass clear. Wilson, a hand on the same watch, testified that, when he saw the Scotia, he also saw both a red and a white light. The master himself, after the Berkshire had fallen off so as to bring the bearing of the Scotia abeam, saw the Scotia's red light; and there can be no just pretence that a collision could have occurred, if he had then countermanded his order, for he could not have at that time reached the course of the Scotia, if her red light was in full view. The master testifies, that he had before that seen two lights on the Scotia, namely, one bright light and another the color of which he says he could not distinguish, but which he concluded was green, and, though he cannot swear it was green, he says it was not red. The course and position of the two vessels render this statement very improbable; and I am more disposed to credit the lookout and wheelsman on that point than the person who gave the unfortunate order, and on whom, if in fault, rests a very heavy responsibility.

Second, as to the Scotia. Her lights were all set and burning bright, a white light at mast-head, a green light on the starboard and a red light on the port side. She saw the Berkshire's white light near the horizon, off her port bow. She had no reason to anticipate danger of collision, and did apprehend none, until she saw that light closing in upon her bow, and the officer in command then immediately gave an order to port, then hard-a-port, and, observing that the light still closed in, gave the order to slow and then to stop. The engines were at once slowed, stopped and reversed, but the vessels, notwithstanding, came together.

Irrespective of the legal questions arising upon the undisputed fact that the Berkshire was not carrying the lights prescribed by the navigation laws of the United States, to be hereafter adverted to, it is upon this conduct of the Scotia that the question of fault on her part arises. For, conceding the general rule of the maritime law, prior to recent statutes, to be, that, when a steamer and a sailing vessel are approaching each other, so as to involve danger of collision, it is the duty of the steamer to keep out of the way of the sailing vessel and conceding, also, that, un-

der such circumstances, the mere fact of collision is prima facie evidence of fault and negligence in the steamer, this rule is not so unyielding and arbitrary that it may not be shown that, in truth, she exercised due care and acted in all respects prudently under the circumstances.

The fault in her conduct supposed, involves two enquiries: (1) Ought she to have slackened her speed sooner than she did? (2) Was it improper for her to port her helm when she did? And these enquiries also involve the more general one, was there any other step or manœuvre which ought to have been taken?

1. Whether the light she saw near the horizon was on a steamer or on a sailing vessel, no duty to slacken speed or change the course of the Scotia arose until there was some reason to apprehend a collision. The duty first called into exercise, on discovering the light, was to observe it closely, to see whether or not there was reason to apprehend such danger. The suggestion that it was her immediate duty to slacken speed when she saw the light, assumes what is not in the first instance to be assumed. The suggestion that, not knowing the course of the vessel bearing the light, she should have slackened her speed till she could ascertain such course, assumes that the apprehension of danger was the immediate consequence of seeing the light. Not so. If she saw the light and observed it diligently, without having reasonable ground for apprehending collision, no duty to either slacken speed or change her course was created. This makes the allegation and proof of the claimants, that the location of the light on the Berkshire, (so near the surface of the water as it confessedly was,) actually misled the officers of the Scotia in regard to the distance of such light from the steamer, important ones. Carrying a light in such a location was well calculated to mislead and did in fact mislead. But the still more important fact, that, when seen, the light was off the port bow of the Scotia, as to which there is an entire and conclusive concurrence of testimony, if followed by the opening of such light still further on her port bow, before the steamer ported her helm, is conclusive that, during the interval, and until that light began to close in, the officers of the Scotia had no reason to apprehend danger.

It is because of this that great importance is attached to the question, did the light of the Berkshire open on the port bow after it was seen by the Scotia, and before she ported her helm? The libellants insist that it did not; that the course of the Berkshire, when discovered by the Scotia, had already been changed by falling off; that such opening on the port bow of the Scotia was, therefore, impossible; and that, if such opening in fact occurred, it would have been impossible for the Berkshire to thereafter reach the track of the Scotia (when sailing at only about one-half the speed of the latter), until after the Scotia had passed. I am satisfied that the reasoning upon both these propositions is fallacious, and that the premises assumed therein do not necessarily establish the conclusion. But, in the first place, the officers and men on the Scotia are unqualified and clear in their testimony, not only that they were alert and vigilant in their observations, but that, after being discovered, the light on the Berkshire did open on the steamer's port bow. On this point they cannot, I think, be mistaken, and, to suppose them to misstate on such a point, is to impute to them intentional falsehood. Such a circumstance is not like a matter of judgment or opinion or estimate, as to which the liability to error is, by most collision cases, proved to be very great. The witnesses differ, it is true, in their estimate of the degree of such opening, and they differ very largely. This may be accounted for by their different posts of observation, or other grounds of questioning the correctness of their estimates, but the fact of such opening is nevertheless well established by their distinct concurrence therein. It is, nevertheless, claimed that, conceding the fact, still there is an error as to time, and that such opening took place after and not before the porting of the steamer's helm. This is urged in the face of the positive testimony of the witnesses to the contrary, and it is claimed that such positive testimony is overborne by the fact that the Berkshire, before her light was first seen, had fallen off, and was then and continuously thereafter sailing on a starboard helm, and so her opening on the port bow of the Scotia was impossible until the latter ported. This is the proposition first above stated and which I deem fallacious. The fact that the Berkshire had, when seen, already starboarded, does not forbid the opening of her light on the Scotia's port bow.

It has, I think, already been shown, that, when her light was seen, the Berkshire had passed a considerable distance eastwardly beyond the point of intersection of the two courses; and that she starboarded her helm not to exceed one minute before her light was so seen, if, as insisted by the claimants, it was not later. The order was first to starboard and afterwards to hard a-starboard. The speed of the Scotia was about double that of the Berkshire, while the latter was on her course. Her movements, first to starboard and then falling off, certainly did not diminish the disparity, but probably increased it, in the first stage of the movement of the Berkshire. Her light was first seen from the Scotia, from one to two points off her port bow. Now, with these facts in view, the allegation that the light of the Berkshire could not open further on the port bow of the Scotia is wholly unwarranted, and the uniform testimony of the witnesses from the Scotia is not to be overborne by such an assertion.

Considering the greater speed of the Scotia, it is perfectly easy to find them in such relative position, after the light was first seen, that the opening upon such port bow would be quite distinct and obvious. For, while the Scotia advanced on her course one mile, the Berkshire, on her starboard helm and with her less speed, may not have neared the track of the Scotia so as to counterbalance the tendency of the Scotia's motion to open the light very largely. Thus if the Berkshire had remained stationary or been on her original course, her light would have passed rapidly to the port of the Scotia. If the Berkshire was moving obliquely towards the track of the Scotia, this movement would have the counter tendency. But, whether such light would or would not continue still to open, would depend on the degree of change produced by her starboarding, and the relative speed which she then maintained. The inference that the testimony of the witnesses is erroneous is, therefore, not only unwarranted, but, in my judgment, the entire proofs on this precise point confirm that testimony.

But, the maintenance of her starboard helm, tended continually to bring the Berkshire around full before the wind; and then, putting her helm hard a-starboard brought her with even increased speed nearer the track of the Scotia, closed in her light just before the collision, and put the Scotia to instant efforts to avoid it. This involves the accomplishment by the Berkshire of the second alleged impossibility above argued by the libellants, which I have called deceptive or fallacious. It is said that, at her less rate of speed, she could not, if her light had so opened on the port bow of the Scotia, have thereafter reached the track of the Scotia until the latter had passed, and that, if the Scotia ported her helm as soon as the light of the Berkshire began to close in, the latter could not have overtaken the former. Obviously, this depends upon the precise location of the Berkshire when such closing in began, and the distance then between the vessels, with the speed attained by the Berkshire then sailing before the wind; and, unless it be assumed that her light had opened very considerably on the port bow of the Scotia before the change was discovered, her distance from the place of collision was greatly less than that of the Scotia. And the fallacy of the reasoning is greater, in view of the fact that the Scotia slowed and reversed immediately on porting her helm; and this was done instantly on such closing in becoming apparent.

To my mind the conclusion is inevitable, that there was nothing in the position or movement of the Berkshire that suggested, or even warranted, a suspicion of danger of collision, until the closing in of the light of the Berkshire upon her port bow became apparent; and, therefore, the Scotia properly kept her course down to that moment.

2. Was the Scotia in fault for then porting her helm, and slowing, stopping and reversing her engine? That slowing, stopping and reversing were proper, requires no discussion. And it is important to note here particularly, that, at this moment, the Berkshire was very near and off the Scotia's port bow. It was a question of judgment, whether, in that moment of sudden extreme peril, it was wisest to go to port or to starboard. It was night. The distance of the Berkshire at that instant could not be known. If the Scotia attempted to go to port, it was not at all improbable that she would meet the ship while in the act of turning, while, by turning to starboard, there was a like uncertainty. Her officers must choose. They did exercise their judgment in good faith, and yet the collision ensued. In my judgment, upon all the proofs, there was time but for a slight turn in her course; and they did what seemed to them best at what was, in view of the headway of the two, a moment of sudden peril, and very shortly before the contact of the vessels. I should hesitate very much in concluding that the porting of the helm showed either want of skill or due care in such circumstances, even if, by the light of the after result, it seemed probable that, had she starboarded, she would have gone clear.

This, however, is not all. The whole conduct of the Berkshire was unskilful and misjudged. The movement by which she was placed in peril was wholly her own; and, although it may have been made before the Scotia saw her light, it was, in truth, improvident and erroneous. I agree fully with one or more of her crew, that it was uncalled for and produced the collision. In short, she thrust herself in the track of a steamer in full view, when there was time for more deliberation, when she was not in the least danger, and when a minute more of deliberation, before changing her course, would have shown, by unmistakable signals, that there was no danger, and that she could and ought to keep her course. It is not unjust to her, and it is only fair to the Scotia, to say, that, by this, she involved the Scotia in that precise condition of doubt, in which, by stopping and reversing, the latter did all she could to arrest her own speed, and in which her officers were put to the exercise of judgment, as to the measure most likely to avoid collision.

Again, in this immediate connection, if it be conceded that the statute regulations were not binding upon the Berkshire, and that the presence of the white light did not, by reason of those regulations, require the officers of the Scotia to infer that she was a steamer, it is equally true that there was nothing to show that she was a sailing vessel. She might be the one or the other; and if, on the instant of apparent danger, the Scotia stopped her engines and reversed, it ought not to be imputed to her as a fault, that, in her further effort, made in the exercise of an honest judgment upon the subject, she con-

formed to the regulations which, in view of her being in the track of an immense commerce between England and the United States, were presumptively binding upon her.

The rule so strenuously relied upon by the libellants, by which it is made the duty of a vessel propelled by steam to keep out of the way of a sailing vessel, is not so arbitrary and inflexible as to make the former, under all circumstances, an insurer of safety to the latter. It assumes that, by reasonable skill and care, the former may know that the vessel in view is a sailing vessel, and that there will be time and opportunity, after the discovery of danger, to take measures effective to avoid her, and that the exercise of an honest judgment, by men of competent skill, and in the exercise of active vigilance, will enable the steam vessel to do so.

Moreover, I do not agree, that, even considering that our statute regulations had not the force of law to bind the Berkshire, it was a fault in the Scotia to mistake her for a steamer, and to act upon the assumption that she was one. If she was justified in that respect then she was justified in what she did; for, then, by the general maritime law, apart from the statute, she was bound to turn to starboard, unless the circumstances clearly indicated that this would render a collision more probable. The general rule required her to go to starboard, and, where the circumstances are doubtful, the rule is the same. Mr. Justice Clifford, in New York & B. Transp. Co. v. Philadelphia & S. Steam Nav. Co., 22 How. [63 U. S.] 461, 472, says: "Beyond question, the law is well settled, that steamers approaching each other from opposite directions are respectively bound to port their helms and pass each other on the larboard side." He cites numerous cases from the English court of admiralty, and from the supreme court of the United States, in which the principle is applied where it was doubtful which course would be most effectual. The officers of the Scotia were acting under the actual pressure of the English navigation laws, which, it is conceded, were operative upon them, since, by the proclamation thereof, they were applied to the vessels of both countries, so far as she was concerned. They knew that they were in the track of vessels navigating between the two countries. They may properly be assumed to have known that there was a strong probability, at least, that vessels in that track would carry lights indicating their course and character. So far from being in fault in the inference drawn from seeing the white light near the horizon, namely, that it was the masthead light of a steamer just coming into view, such an inference was natural; and, in carrying such a light, the Berkshire invited that inference, or, at the least, placed herself in such a situation as was liable to mislead, and did in fact mislead the other, and she ought not to be permitted to allege fault in the latter in acting according to an honest

judgment thereupon, and in conformity with the rule of navigation which applied to the conclusion thus formed, namely, that she was a steamer.

These views, independently of the critical examination of the positions, courses, distances and bearings of the vessels respectively, in which I have indulged, seem to me to show that the Scotia was without fault, and, although they are not in harmony with some of the views expressed by the learned judge who tried the case in the district court, they lead to an affirmance of his decree.

I am aware of the very great difficulty of reasoning with strict accuracy, and of applying close mathematical tests, where witnesses disagree, and various hypotheses may be suggested to account for their discrepancies and for the occurrences of which they speak. As already remarked, the court must deal with the case upon the testimony, notwithstanding its conflict, and in the face of all the doubt and uncertainty which it gives rise to. Out of these materials I have arrived at the best judgment I can form, after a long and careful examination and comparison; and I derive some corroboration of my conclusions as to most of the details of time, place, distance, course and bearings, from the full analysis of the whole case in the very able argument of the counsel for the libellants, wherein his conclusions are very nearly identical with my own on these points.

If however, I were in so great doubt that I deemed it unsafe to rest upon the conclusions already stated, there would still remain in support of the decree dismissing the libel, the ground upon which the decision was placed by the district judge, namely, that the Berkshire did not carry the lights prescribed by the navigation laws of the United States. The absence of the red and green lights, and the presence of a white light in contravention of those laws, actually misled the officers of the Scotia into the belief that she was a steamer, which alone is authorized to carry a white light. Being thus misled, the officers of the Scotia did just what, upon the assumption that she was a steamer, it was her duty to do; and, as a necessary result, the collision was solely due to the fault of the Berkshire herself, and, therefore, she cannot recover.

These conclusions were placed below not on the ground that the navigation laws of the United States ex proprio vigore operated upon the Berkshire in her relation to a vessel of another nation, but that those laws have been adopted by all the principal maritime nations for the government of their own vessels, and that the court, taking judicial notice of that fact, are bound now to say that those regulations have received such general assent, as reasonable, proper and expedient, and, by such enactments, have been given so broad an application that they are now rules of the sea. If this reasoning be sound, it would seem to follow, that the vessels of all nations are now bound to observe them, whether their own par-

ticular government has approved them or not; for, if the general consent of nations. however expressed, is effectual to establish international law, the failure of a particular nation to express its consent does not destroy the rule.

Without placing my conclusion upon this idea, that the statutes of the several nations referred to have operated to make a rule of the sea or general maritime law, I prefer to state another view of the subject, not in harmony with the English decisions, but I think clearly just, and conformable to a more worthy estimate of what is due to ourselves as a nation interpreting its own laws, and no less just in its operation upon our own citizens, who, it may be conceded, are the immediate objects of legislative care and providence. While it is true that our navigation laws are, in a strict technical sense, municipal, because we have no power to legislate for other nations, or to enforce our laws beyond our own jurisdiction, they are, in their nature and scope, and, as I think, in their design, for the benefit of all mankind. The safety of human life and property on the highway of nations is of international concern. If the government of this people have adopted a rule to promote such safety, it is because it is wise and best to that end, and so our courts must declare. For this people and for our courts it is the rule of right reason, whether we can enforce it upon the people of other nations or not. It being wise and best, we can and do send out our navy and our mercantile marine charged with the duty to observe it, because it tends to secure the worthy purposes for which it is enacted. True, we can subject no others to its pressure as a law to them; but it is a narrow and technical view to say it is like the ordinary subjects of legislation, which are plainly only intended to operate within our immediate jurisdiction. The business it regulates is as extensive as the limits of the seas; and there are numerous rights of person and property which we recognize as governed by law, and which will be enforced and protected by our courts in whatever part of the world they originate or are invaded. Sending out our navy and marine instructed by our statutes, it is selfish and unworthy to say—although these rules for the preservation of life and property are eminently fitted to benefit all mankind, are expedient and advantageous as guides to your probable intercourse with other vessels, they do not require you to regard them towards any but vessels of our own nation. It is a more honorable and worthy language to say—if you disregard them, and loss is thereby caused, you shall not have a standing in our courts—perform your duty to observe our laws, and here and in our courts you will be protected, whether other nations are or are not just enough and wise enough to impose the same duty upon their vessels which you are liable to encounter.

My conviction, that sound judgment and right reason demand the observance of these rules, finds support and strength in the fact, that nearly all maritime nations have adopted them; but I would not make that a condition of their enforcement.

Again, if the considerations of prudence which have led to the enactment of these laws are less comprehensive in their scope, the reason for insisting upon their observance by our own vessels is not lessened. If those enactments are not, (as I have above suggested,) for the benefit of all mankind, and have no regard to the general safety of human life or property, as of international concern, they have respect to the lives of crews, passengers and property on board of our own vessels, as objects of special and providential legislation. Wherever our vessels may be and whomsoever they may meet upon the high seas, they and all on board are subjects of national solicitude. The observance of these laws gives early notice of their proximity, and, with such notice, the acknowledged law maritime puts all other vessels, of whatever nation, to diligence to avoid collision, and so tends to the safety of what are confessedly the objects of our care—the lives of our own citizens and their property. If to our legislature it is a matter of indifference whether the lives and property of citizens of other nations are made safe or not, it is matter of deep concern that our own are protected; and let it be remembered, that, in case of collision, we may be the chief or only sufferers, as well illustrated in the case now before the court. When one of our passenger ships is run down at sea by a foreign vessel, and the collision is plainly owing to a failure by the former to observe our laws, it is poor satisfaction to say—true, this neglect has caused the sacrifice of valued lives, but our legislature only intended to guard against collision with a vessel of our own nationality. Nor is this the truth. Our legislature has had regard not merely to the interest of owners of ships, not merely to the preservation of the property on board. but, as guardian of the lives of our citizens, whether crew or passengers, has prescribed rules which will serve in a large degree to protect them wherever upon the seas they may be, and whether any or many other nations observe like rules or not. In this much more selfish and narrow view of the subject than I have above suggested, our vessels are always and every where acting under the pressure of these rules and of the reasons for their enactment, and should not be permitted to disregard them. Our own interests and the declared wisdom of their observance forbid it, the lives and property of our own citizens at hazard forbid it. and none should be permitted to come into our courts of admiralty—in a very high sense, courts of equity—with unclean hands, to claim indemnity for a loss which is proved to be solely caused by their own wilful disregard of these regulations.

The decree dismissing the libel must be affirmed.

[On appeal to the supreme court. the decree of this court was affirmed. 14 Wall. (81 U. S.) 170.]