THE ANNA C. MINCH (two cases).

(District Court, W. D. New York. August 11, 1919.)

1. Collision ⬥73—Breaking Adrift of Moored Vessel Creates Presumption of Fault.

A vessel which breaks adrift and collides with another vessel is prima facie chargeable with negligence, and is liable in damages, unless she proves that the accident was not preventable by a proper degree of care and maritime skill.

2. Collision ⬥68 — Vessel Breaking Adrift not Liable when Moored with Best Judgment of Master.

Where the captain of a vessel has exercised his best judgment and skill in her mooring she cannot ordinarily be held liable for damages caused by her breaking adrift although the result may show that his best judgment was erroneous.

3. Collision ⬥68—To Sustain Defense of Inevitable Accident on Vessel Breaking Adrift, Reasonable Care Sufficient.

To sustain the defense of inevitable accident in the breaking adrift of a vessel, it is not necessary that the highest degree of care and precaution should have been exercised, but only reasonable care to avoid danger fairly to be anticipated is required.

4. Collision ⬥68—Vessel Breaking Adrift by Breaking of Ice Jam Inevitable Accident.

The breaking adrift of a steamer moored at an elevator in Buffalo river in early spring to discharge a storage cargo of wheat *held* due to inevitable accident, and the vessel not liable for resulting collisions; it being shown that, while a freshet with running ice was to be anticipated, it was promptly guarded against by additional mooring lines, which would probably have been sufficient, but for a sudden rush of water and ice, caused by the breaking up of a jam by a fire tug.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by the American Steamship Company, owner of the steamer Theodore H. Wickwire, Jr., against the steamer Anna C. Minch and by William M. Tashenberg and Fred C. Tashenberg, owners of the launch Tashenberg Brothers, against the same. Decree for respondent.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards and L. E. Coffey, both of Buffalo, N. Y., of counsel), for libelants.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, and Stanley & Gidley, of Buffalo, N. Y., for respondent and claimant.

HAZEL, District Judge. In these two libels in rem, which were tried together, it is alleged that the American Steamship Company, owner of the steamer Theodore H. Wickwire, Jr., and William M. Tashenberg and Fred C. Tashenberg, owners of the launch, or supply boat, Tashenberg Brothers, sustained damage because of negligence in mooring the Anna C. Minch to the dock at the Electric Elevator in Buffalo, in consequence of which she broke adrift during an ice flood, and without stopping, as it was possible for her to do, came into collision with them. The Wickwire (for short) is claimed to have sustained injury to the amount of $14,000, and the launch Tashenberg Brothers to the amount of about $5,000. The mishap occurred between 5 and 6 p. m., March 27, 1916, at a point where the channel is approximately 200 feet wide. The master, first mate, and a seaman of the Minch (for short) were aboard at the time. In anticipation of the movement of the ice, extra lines were put out during the forenoon to hold her to the dock, but she nevertheless broke adrift. The evidence shows that the Minch had been towed from her winter quarters at the Breakwall in the outer harbor, to the Electric Elevator, to unload her storage cargo of 225,000 bushels of wheat; one-half being unloaded before she broke adrift. She was a large freighter, fully 400 feet over all, 50 foot beam, draft 16 feet aft and 10 feet forward.

The answer denies negligence, and alleges inevitable accident or vis major, due to an extraordinary ice flood, and, specifically, that fire tugs, engaged in breaking the ice jam near where the steamer Minch was moored, caused unusual pressure against her bow, parting her cables and carrying her downstream; that her anchor could not be cast because when the cable was parted the anchor gear in the windlass room was injured. In no event, the amended answer alleges, could the anchor have held, or prevented the steamer from drifting after breaking away, because of the force of the current and the weight of the ice.

In his opening statement proctor for respondent requested permission to amend the answer, so as to embody an admission that the Minch came in contact with the Wickwire and Tashenberg Brothers, or, in the alternative, that she struck the Wickwire, causing her to collide with the launch or supply boat. The amendment being allowed, proctor for libelant moved to amend the libel in the Tashenberg Brothers Case, alleging that because of the collision between

the steamers the launch was caused to be set adrift. After a suggestion that a written amendment to the libel be filed, the taking of testimony proceeded. No amendment to the libel, however, was filed until nearly a year after the close of the testimony, after which an amended answer thereto was filed. Libelant at a later date moved to strike out certain parts of the amended answer, as varying from the amendment allowed at the trial. It was contended that the amendments made at the trial gave respondent the right to open and close the case, while the written amendment put upon libelants in the Tashenberg Case the affirmative of the issue. This view, however, is not acceptable, and the motion to strike out is denied.

The Minch had no steam up at the time of her accident, and when her lines parted, as the ice moved suddenly, she drifted stern first nearly 1½ miles to the foot of Main street, passing on the way through the Michigan street and Ohio street drawbridges without touching either; both bridges being hastily opened by the tenders to let her through. Before she broke adrift the fire tug Potter was engaged in breaking the ice congestion just abreast of the stern of the Minch above the Ohio street bridge, while other fire tugs were similarly engaged in other parts of the river.

When the Minch in her drifting reached the Lackawanna Depot dock, about 500 feet from the Michigan street drawbridge, she struck the steamer Wickwire on her port bow, breaking her cables and causing her to drift. The launch, at the time of the collision, was fastened to the Wickwire's port quarter, and she, too, broke adrift. All three vessels then floated a short distance downstream towards the lake, when the Wickwire's port anchor took hold and her drifting was checked. Just prior to this, however, she had collided with the steamer John B. Cowles, which was moored near the foot of Main street. The Cowles and Wickwire, with the barge Constitution, lying near the Lackawanna freight sheds, completely blocked the river. The launch meanwhile had been crushed between the steamer Minch and the dock, in spite of efforts to avoid such injury. The Minch finally held fast in the ice at Main street.

Liability is attributed to the Minch on the grounds that the freshet could easily have been anticipated by her master; that she was insecurely moored, her lines and cables being badly adjusted; that she was improperly equipped for an emergency of the character specified; and that her drifting could have been stopped before inflicting the injuries in question.

[1] When a vessel breaks adrift and collides with another vessel, she renders herself liable to damages for the loss sustained, under the doctrine of The Louisiana, 3 Wall. 164, 18 L. Ed. 85, unless it appears that her breaking away was due to inevitable causes which human agency could not have prevented. The vessel breaking adrift is required to rebut any prima facie evidence of negligence by proving that the cause of the accident was not preventable by a proper degree of care and maritime skill. In the English case of The Merchant Prince, 7 Asp. 208, after stating this rule—a rule

pretty generally adopted in this country (The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552)—the court says that it is necessary for the vessel proceeded against to show the cause of the accident, and also that the result was inevitable, or to show all possible causes, one or the other of which produced the effect, and that in each case the result could not have been avoided.

Although the evidence in this case shows that the freshet was something that should have been anticipated by the master of the Minch, in view of weather conditions, it is believed that the fire tug Potter, in breaking up the ice jam near the Minch, released such a volume of ice and water that the mooring lines of the vessel were broken, and that this sudden unexpected force could not have been foreseen. There was an unusual amount of ice and snow in the river in March, 1916; the ice at various places being approximately five feet above the level of the water. The Weather Bureau reports show reduction of snow and ice by melting from 20 inches to three-eighths of an inch between March 24th and 28th.

Walsh, captain of one of the fire tugs, who arrived on the scene at 6 p. m., almost an hour after the Minch broke adrift, said that it was the severest freshet he had seen in his experience of 31 years; the current at this time running from 9 to 10 miles an hour. The witness Hyland, captain of the fire tug Potter, likewise swore that the ice at the Ohio street drawbridge, where the tug operated, seemed to be holding to the bottom; that clampers about 10 feet square were standing out 5 or 6 feet above the level of the water; that he had difficulty in breaking up the ice, but that suddenly it came down swiftly against the drawbridge and he was unable to turn the tug around; and that at this time he saw the Minch drift quickly through the bridge. Other witnesses for respondent gave similar testimony as to the severity of the weather conditions and velocity of the current, both at the time of the accident and during the ensuing night.

On the other hand, there were credible witnesses for libelants, familiar with ice floods and freshets in the river in other years, who had seen fire tugs blasting out ice jams, and who testified that other freshets had been quite as severe. The witness Jackson, for instance, testified that the conditions were not unprecedented. He saw the Minch drift through the drawbridge, and said that the current was about 6 miles an hour, increasing to 8, and that he had seen ice conditions in the river quite as bad in previous years, and had assisted in breaking ice jams in the same locality. Wilson, superintendent of the Electric Elevator, testified that the ice jam was worse than any he had previously seen, though the current was not any stronger, nor the quantity of ice greater; and Fitzgerald, an employé who had lived all his life in the vicinity, and Bridge Tenders Callahan and Stanton, swore that ice gorges were not infrequent in that part of the river in the spring of the year, although there had been none for several years.

It may, however, be justly determined, considering the testimony in its entirety, that the freshet was unusually severe; but in the spring

of the year freshets should be anticipated and guarded against by steamers moored in the river. The quantities of ice and the rapidly changing temperature on several days prior to March 27th, the thaw, the moving ice mentioned in the Lake Survey Bulletin—a publication in the master's possession—should, and not improbably did, admonish him of the liability of injury to his vessel. Unquestionably he was, therefore, to exercise such care and caution as were commensurable with the circumstances.

Was the Minch securely fastened to the dock? She was originally fastened to the spile with wire cables and a manila line, such as were customarily used forward and astern in ordinary weather. At about 10 a. m., however, owing to the threatening aspect of the weather, additional lines were put out; but libelant asserts that no turns of the lines were made around the spiles, as there should have been in order to obtain greater resistance; that the loops at the ends of the lines were simply placed over the posts on the dock, and that the lines or cables became weakened and strained; that the strain was not equalized, and hence the moorings could not hold. Such claims of negligence are, however, not proven.

The evidence shows that two mooring cables and a manila line were put out at each end, a ⅞-inch wire cable forward and a 1-inch wire cable aft, and extended from two mooring engines placed forward and aft; the 6-inch manila line extending from the windlass room. Two extra lines—a harbor 8-inch tow line and a lake hawser —were used in anticipation of the freshet; such lines being suitably arranged with a bight to be used forward and aft. The mooring cables were slacked off the drum, a turn secured on the timber heads, a bight put out, and three parts extended to the dock. Lines were arranged astern and abreast in practically the same way, while the side of the vessel was close to the dock, with her stem about 25 feet therefrom. There is evidence showing that the strain on the hawser was equalized by pulling a suitable tackle of two double blocks in the windlass room, and that the 8-inch line was pulled taut on the dock—the cables with a winch and the manila line with the capstan.

The master's testimony with reference to the additional lines and the manner of arranging them finds some support in the observations of the witness Vantine; but positive testimony by a master, who tells us what he did regarding the moorings, is ordinarily more satisfactory than the testimony of a witness who had no part in the actual operations. The Fannie, 11 Wall. 242, 20 L. Ed. 114; The Morton, 17 Fed. Cas. 9864; Wilder's S. S. Co. v. Low, 112 Fed. 173, 50 C. C. A. 473. The harbor master testified that the steamer in his opinion was well moored, considering that she was at the dock discharging cargo, and not in winter quarters, and Capt. Benham also expressed the view that the moorings were good and sufficient.

[2] It is asserted, however, that hand power was inadequate for equalizing the strain on the lines and cables, but this was the common method of equalizing strains on towlines by the use of tackle, and there was apparently no difficulty for the master, mate, and the sea-

man who assisted them, in tightening the lines and cables. In my opinion, based on the evidence, the moorings were reasonably sufficient in number and quality for holding the steamer to the dock in anticipation of the freshet. In this connection it is also to be remembered that, when a captain of a vessel has exercised his best judgment and skill, as in my opinion did Capt. Kelley, he cannot ordinarily be held liable for damage sustained, although the result may show that his best judgment was erroneous. There are many adjudications in support of this principle.

[3] To sustain the defense of inevitable accident it is not necessary that the highest degree of care and precaution should have been exercised; the decisions holding that only reasonable care to avoid dangers fairly to be anticipated is required. The Grace Girdler, 7 Wall. 196, 19 L. Ed. 113.

It is also contended that the steamer Minch was negligent in failing to drop anchor after she went adrift and in having only one anchor available. It appears that a forward anchor was left at the breakwater, where the Minch had been during the entire winter, and that it is common practice to leave one anchor and chain there when vessels go into the harbor to unload, expecting to return. Hence she is not to be condemned for conforming to such custom. If the anchor had been cast, and had succeeded in penetrating the ice, it would, according to the evidence, probably not have stopped the drifting of the Minch, since the bottom of the river for a distance of about 1,600 feet downstream was of rock. The mate was ordered to let go the anchor as soon as the steamer went adrift, but could not do so, as the riding pawl had become meshed in the chain when the moorings parted, which prevented the anchor from running out. Even though in the excitement of the moment the master made a mistake and failed to instantly drop the anchor, such failure would not amount to actionable fault, as it cannot be definitely determined that such failure contributed to the collisions.

Importance is attached to The William E. Reis, 152 Fed. 673, 82 C. C. A. 21; libelant claiming that here, as in that case, the burden of proof resting upon the vessel to show that her breaking adrift was the result of vis major or inevitable accident has not been sustained. In the Reis Case the court found that the fastenings, though originally sufficient, became insufficient when the flood arose. But here, as has been pointed out, additional lines were put out in anticipation of adverse weather, which were parted by the irresistible force with which the ice and water came against the steamer when the ice jam was broken up by the fire tug Potter.

In The E. M. Peck, 228 Fed. 481, 143 C. C. A. 63, it appears that a thaw set in, breaking up the ice and creating unusual conditions, with the result that five additional lines were run out from the steamer; but the ice gorge nevertheless parted the lines. The court held that the drifting of the steamer was the result of inevitable accident. In that case, it is true, several other steamers broke adrift; but the conditions were not precisely the same here, as the other ves-

sels herein involved, which were moored in the river, had out their winter moorings (chain and boom were used on the Kongo), and they were not similarly exposed to the force of the ice congestion. However, the anchor chain of the Kongo, a wooden vessel moored on the opposite side of the river from the Minch, parted, and the anchor of the steamer Hart, farther up the stream, also failed to hold.

[4] The conclusion follows that libelants' contention that there was a lack of nautical skill in mooring the steamer Minch is not sustained; everything having been done which a careful and prudent man would do under like conditions. The movement of ice, true enough, was to be expected; but the proofs are that reasonable precautions were promptly taken to meet it, and the steamer would in all probability have remained securely fastened to the dock, if the fire tug Potter, in breaking up the ice, had not produced at the Ohio street bridge, just astern of the Minch, an unexpected rush of water and pressure of ice against the steamer's bow—a condition which the master of the Minch could not, in the exercise of ordinary care, have foreseen. In my judgment the breaking adrift of the vessel in his charge and under his control was the result of inevitable accident; nor were the injuries sustained by libelants in consequence of such accident due to his negligence.

The libel is dismissed, with costs.