### TIDEWATER ASSOCIATED OIL CO. v. UNITED STATES.

#### No. 2628 Civil.

District Court, S. D. California, Central Division.

March 20, 1945.

McCutchen, Thomas, Matthew, Griffiths & Greene, Farnham P. Griffiths, Harold A. Black, Charles E. Finney, and Russell A. Mackey, all of Los Angeles, Cal., for libellant and cross-respondent.

Arnold W. Knauth, Atty., Claims Division, Department of Justice, of Washington, D. C., and Charles H. Carr, U. S. Atty., and Robert E. Wright, Asst. U. S. Atty., both of Los Angeles, Cal., for respondent and cross-libellant.

J. F. T. O'CONNOR, District Judge.

*Statutes under which the libel was brought:*

This suit in admiralty was instituted by the filing of a libel on December 14, 1942, by the libellant, Tidewater Associated Oil Company, a corporation, as owner of the American tank steamship, hereinafter referred to for military security as libellant's vessel "A", against the respondent, United States of America, as owner and operator of the steamship, hereinafter referred to for like military security, as respondent's vessel "B", in a cause of collision, civil and maritime, pursuant to and by virtue of the authority given in the Suits in Admiralty (Public Vessels) Act of March 3, 1925, c. 428, 43 Statutes at Large 1112, 46 U.S.C.A. §§ 781–790, as well as pursuant to, and by virtue of, the authority given in the Suits in Admiralty (Merchants Vessels) Act of March 9, 1920, c. 95, 41 Statutes at Large, 525, 46 U.S.C.A. §§ 741–752, as a result of a collision between these two vessels which occurred in the early morning hours of December 5th, 1942, on the Pacific Ocean off Point Conception, California, in which, according to the libellant's pleading, the libellant claims damages amounting to approximately $125,000. Respondent, in addition to its answer, has filed a cross-libel for damages approximating $56,767.72 to respondent's vessel "B", alleging negligence on the part of the libellant. Hereafter, for brevity, the libellant and cross-respondent will be referred to as the libellant, and the respondent and cross-libellant will be referred to as the respondent.

At this point, in order to more clearly elucidate the court's opinion, there is inserted herewith a short sketch which, al-

though it has no military value because it is not drawn to scale, very clearly and quickly illustrates the points of origin and the designated courses the two vessels were instructed to take to reach their destinations safely, and the approximate point of contact between the two vessels. It will be seen from an examination thereof that the libellant's vessel "A" was en route from Ventura to San Francisco, Calif., and the respondent's vessel "B" was en route from San Francisco to Hueneme.

SKETCH OF THE COLLISION

As to the facts of the collision itself, both sides have stipulated that the collision occurred in the early morning hours of December 5th, 1942, off Point Conception on the California coast, at about 4:37 A. M., and that both vessels were sailing blacked-out under instructions from the Navy Department. Necessarily their sailing blacked-out cannot be imputed as an act of negligence on the part of either vessel. The respondent admits that the United States Navy was and is a competent military authority to issue such instructions under war conditions and admits that the libellant's vessel "A", at the time of the said collision and prior thereto, proceeded in conformity with said instructions, and upon the routes and courses designated for her by the said instructions.

*Knowledge of instructions of Port Director's Office at San Francisco, by respondent:*

Prior to departure of respondent's vessel "B" from San Francisco to Hueneme, the Court finds that respondent's vessel "B" was given a certain designated course to follow at the Port Director's Office in San Francisco; and, as to these instructions, the master in charge of respondent's vessel "B" stated in his deposition, as follows:

"Q. By Mr. Mackey (proctor for the libellant): Captain, you received instructions at San Francisco concerning your navigation from San Francisco to Hueneme, didn't you? A. Yes.

"Q. And those instructions came from the Port Director's Office at San Francisco? A. Yes.

"Q. That is the Port Director's Office of the Navy, isn't it? A. Yes.

"Q. And were those instructions written or verbal? A. Well, they were written.

"Q. And you were given three points to pass through from the point of departure at the Farallones to your arrival at Hueneme? A. Yes.

"Q. And those points you say were designated 'B', 'C' and 'D', that is correct, isn't it? A. Yes.

"Court's note: Points 'B' and 'C' are not designated on the sketch (supra) [post] because these points were to be passed prior to point 'D'.

"Q. Were you told or informed in writing or otherwise when you left San Fran-

cisco that the 'A' would be coming up northbound? A. No, sir.

"Q. Isn't it a fact that the instructions given to ship masters navigating coastwise, are designed so as to provide a lane of traffic going north and a lane of traffic going south so as to keep the two lanes separate? A. Yes.

"Q. And that is the purpose of giving you points to pass through? A. Yes, sir.

"Q. And your instructions called for you to proceed directly from point 'B' to point 'C' and then from point 'C' to point 'D'? A. Yes, sir.

"Q. That is correct? A. Yes, sir.

"Q. You are supposed to make the transit between those points in the shortest and straightest line, aren't you? A. Well, they do say that you can go to either side of them.

"Q. But the idea is to have you go directly from one point to another in a straight line, isn't it? A. Yes.

"Q. And upon leaving point 'C' your instructions would call for your going in the nearest straight line from point 'C' to Hueneme. A. Yes.

"Q. Weren't you supposed to head from that point 'C' for Hueneme?

"Miss Phillips (proctor for the respondent): Point 'D'.

"Mr. Mackey: I beg your pardon, I mean point 'D'.

"Q. By Mr. Mackey: Supposed to head from point 'D' to Hueneme? A. Yes, sir." (Resp. Ex. No. "A", pp. 75–77.)

*Instructions of the Navy Department had the effect of a statute:*

The primary legal question for the court to determine is this: Did these instructions received from the Port Director's office at San Francisco by the captain of respondent's vessel "B", prior to his departure from San Francisco for Port Hueneme, have the force and effect of a statute; and, if the court so decides, can a violation thereof be construed to be the proximate cause of the accident, or a statutory fault, and prohibit the respondent vessel "B" from availing itself of the doctrine of in extremis. The court sequentially will take up at this point the construction to be placed upon these instructions of the Navy Department.

In accordance with the powers granted by the First War Powers Act, December 18, 1941, c. 593, 55 Stat. 838, 50 U.S.C.A.

Appendix, § 601 et seq., the President, by Executive Order No. 9083, on February 28, 1942, 7 Fed.Reg. 1609, 50 U.S.C.A.Appendix, § 601 note, made the commandant of the Coast Guard, under the Supervision of the Secretary of the Navy, supreme in the matter of the regulation of the navigation of vessels. Under the Second War Powers Act, 1942, 50 U.S.C.A.Appendix, § 631 et seq., the heads of each department responsible for the administration of the navigation laws were directed to waive compliance therewith upon request of the Secretary of the Navy. The Secretary of the Navy took over the full responsibility for the administration of the navigation laws.

Did these instructions which respondent's vessel "B" was instructed to follow have the force and effect of a statute, and what are the necessary implications in admiralty law from a violation thereof?

In The H. F. Dimock, 1 Cir., 77 F. 226, 229 (decided 1896), which was a collision case, the court states the law where a statutory rule has been violated as follows:

"We are aware that the master of the Dimock (the vessel held solely at fault) appears to have been competent for his position, and to have exercised an honest judgment, and, indeed, to have proceeded even more carefully than other steamers navigating practically in company with him. Where the questions are merely those of prudential rules of navigation and of maritime usages, a vessel should not ordinarily be held in fault simply because the courts, with cool deliberation, after all the facts, determine that what was done was mistaken. * * * but here we are dealing with an injunction of the statute, from which the court cannot excuse the Dimock. In Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 272 [37 L.Ed. 1218], *it is said that the statutory rules, and also those made by the supervising inspectors by authority of the statute, are not merely prudential regulations, but are obligatory. To such an extent is this enforced that the* supreme court, in The Pennsylvania, 19 Wall. 125, 136 [22 L.Ed. 148], apparently adopted the English rule, that *the burden rests on a ship to show, whenever she disregards the statutory regulations, not merely that such disregard might not have been one of the causes of the collision, or even that it probably was not, but that 'it could not have been.'* This was apparently restated in Belden v. Chase, at page 699, 150 U.S., and page 272, 14 S.Ct. [37 L.Ed.

1218], in The Martello, 153 U.S. 64, 74, 14 S.Ct. 723, 726 [38 L.Ed. 637], and in The Britannia, 153 U.S. 130, 143, 14 S.Ct. 795, 799 [38 L.Ed. 660.] To understand this strictness, it is necessary to observe that, where it appears that a vessel has only neglected the usual and proper measures of precaution, but has not violated any statutory regulation, the burden resting on her to show that the collision was not owing to her neglect as the efficient cause is only the ordinary one. The Great Republic, 23 Wall. 20, 34 [23 L.Ed. 55.] If there were any doubt that the fault of the Dimock led to the collision, the authorities to which we have referred would probably hold her; but we have cited them, not on that account, as there can be no question here on the matter of proximate cause, but to show the stringency of the rule which prevents us from excusing her merely for the reason that the master acted with an honest judgment under the circumstances of the case." (Italics supplied.)

See also The Suffolk, 2 Cir., 258 F. 219, 169 C.C.A. 287, in support of the doctrine that a vessel which violates a statutory rule must be held in fault for a following collision, in the absence of proof that such violation did not contribute thereto. As to the binding force of the rules of navigation prescribed by the Acts of Congress upon vessels of the United States, see The Scotia, Fed.Cas.No.12,513, 7 Blatchf. 308, 3 Chi.Leg.N. 10, 2 Am. Law T.Rep.U.S.Cts. 60, 3 Am.Law Rev. 582, 5 Am.Law Rev. 382, affirmed 81 U.S. 170, 14 Wall. 170, 20 L.Ed. 822. The doctrine that a violation of a statutory rule or regulation renders a vessel liable for a collision unless it appears that the violation thereof did not cause or contribute to the collision (in other words, unless there has been a novus actus interveniens, or a direct break in the proximate cause of the collision, which will be referred to later) is further exemplified in 15 C.J.S., Collision, § 34, p. 33, where the topical heading states the rule as follows:

"§ 34. A vessel which has violated a statutory rule of navigation, or some other pertinent law, rule or regulation, is liable for a collision unless it appears that the violation did not cause or contribute to the disaster and could not have done so."

It is quite clear from the foregoing authorities that these instructions received by the captain of respondent's ves-

sel "B" at the Port Director's Office in San Francisco, prior to his departure for Hueneme, had the force and effect of a statute throwing the tremendous burden upon him of showing *not merely that such disregard might not have been one of the causes of the collision, or even that it probably was not, but that it could not have been.* The H. F. Dimock, supra.

### Violation of the Port Director's instructions at San Francisco by respondent's vessel "B".

At the time of the collision, the evidence is clear beyond the peradventure of a doubt that the respondent's vessel "B" was off its course, in disregard of the Port Director's orders at San Francisco, and for the reason, as the evidence shows and as the court believes, the captain of respondent's vessel "B" had gone to sleep after leaving San Francisco and had not given the first mate in charge of respondent's vessel "B" the prescribed course to follow. In this connection the respondent, in its pleadings, admits that the master of the respondent's vessel "B" fell asleep after departure of the vessel from a point near the Farallone Islands and left no instructions for his officers with respect to said designated course or courses to follow, or the points to pass through, with the result that said vessel did not change her course when she reached the first of said designated points and proceeded thereafter out to sea in a different direction and away from the designated course prescribed for her, and, at the time of the collision, the respondent admits that its vessel "B" was slightly north of the course designated by the Navy from the third point to Hueneme.

This fact is borne out also by the deposition of the captain of respondent's vessel "B" as follows:

"Q. Now, how far past point 'B' did you proceed before turning south? A. Thirty one and a half miles.

"Q. Why did you not turn at point 'B' and head for point 'C'? A. Well, I had been up so long and I had about—now, I stayed up too—I was down at Redwood City before and we had so much trouble there and I was up all night and I never slept at all there. Otherwise I would have been—

"Q. Were you turned in when you went past point 'B'? A. What?

"Q. Were you turned in when you passed point 'B'? A. Yes.

"Q. You were asleep? A. Yes.

"Q. And had you left any—A. I did not intend to go to sleep but I did.

"Q. What officer was on watch when point 'B' was passed? A. It was the first mate.

"Q. Had you given him any instructions? A. No.

"Q. How did you happen to turn south when you did turn south? A. Well, it was breakfast time and I really woke up before that though, but I didn't think it made any difference because they could go out and go for the next point, I would only have had to haul in and go in this way to make point 'C'. That is the reason I passed that one up and went the other way."

The respondent's vessel "B" finally arrived in the vicinity of point "D" (see sketch supra) and the testimony shows that instead of following a straight course to Port Hueneme, she changed her course at various times and places; and, at the time of the collision, instead of being headed for Port Hueneme she was heading inshore across the course of the libellant's vessel "A" north of Santa Barbara.

The captain of the respondent's vessel "B" virtually conceded that if he had followed the instructions of the Navy Department at San Francisco, and had followed a straight line from the vicinity of point 'D' to Port Hueneme he at no place would have crossed the path of libellant's vessel "A", and, on their passing routes, they would at all times have been at least two miles apart. (Respondent's Ex. "A" pp. 94, 95.) There is no dispute in the evidence about the libellant's vessel "A" being on her proper course from Ventura to San Francisco, and, in view of the fact that both vessels were sailing blacked-out under the instructions of the Navy, no imputation of negligence can be charged to either vessel in this respect.

### Facts of the collision:

This narration of facts brings us to the collision itself; and, at the point of physical contact, both captains place their respective position at slightly different places on the sketch, but it is of no particular consequence, the question for consideration being what actually happened when the vessels first sighted each other and what precautions were taken to avoid the accident. Some of these happenings are in dispute, although this is more or less to be

naturally expected in view of the fact that the angle of vision of those viewing the collision on the moving vessels was different at every moment from the time the vessels first came in sight of each other until the time of their physical contact.

The libellant alleges that at the time of the collision it was dark but the visibility good; that libellant's vessel "A" was on the starboard bow of the respondent's vessel "B"; that said vessels were on crossing courses and that libellant's vessel "A" was on the starboard bow of respondent's vessel "B"; that the respondent's vessel "B" was sighted by those in charge of the navigation of libellant's vessel "A" off her port bow on a course crossing that of the libellant's vessel "A", so as to involve risk of collision; that said respondent's vessel "B" sighted libellant's vessel "A" off her starboard bow and proceeded across her path; and that, in an attempt to avoid the threatened collision, the rudder of libellant's vessel "A" was put hard to starboard, her engines were put full astern and signals of four blasts, one blast and three blasts sounded on her whistle, but that the stem of the libellant's vessel "A" struck the starboard side of respondent's vessel "B" somewhat forward of the latter's bridge. As an act of negligence the libellant further alleges that, after sighting libellant's vessel "A", respondent's vessel "B" negligently directed her course to port instead of to starboard.

The respondent alleges that at the time of the accident the general visibility was poor and dark, and that it was impossible for those in charge of respondent's vessel "B" to determine whether or not the vessels were on crossing courses; that the respondent's vessel "B", when sighted by the officer in charge of the navigation of the libellant's vessel "A", was approximately two points on the port bow of libellant's vessel "A", with her (respondent vessel "B's") green running light showing, and that libellant's vessel "A", when sighted by the navigating officer of the respondent's vessel "B", was between one and two points on the respondent vessel "B's" starboard bow. The respondent further alleges that, immediately upon sighting the libellant's vessel "A", the navigating officer of respondent's vessel "B" showed the running lights of his vessel and stopped his engines, reversed his engines promptly and put the vessel's rudder hard to the port and blew a danger signal almost simultaneously

with the stopping of his engines. According to the testimony of respondent's mate, respondent vessel "B" sighted libellant's vessel "A" first, and was the first to turn on her lights and when both vessels were a distance of about five hundred yards from each other, each travelling about ten knots an hour. Respondent vessel "B" sighted libellant's vessel "A" on "B's" starboard bow (respondent's Ex. A. p. 113). The testimony of the libellant is to the effect that at the time both vessels first came into sight of each other they were two hundred and fifty to three hundred yards apart.

It is clear from the evidence that neither vessel expected to meet the other, the Navy instructions having been silent on this point; and further, that immediately upon the respondent's vessel "B" seeing the libellant's vessel "A", she swung to port because libellant's vessel "A" first appeared as a "dark object". At the time of the collision the libellant's vessel "A" had a lookout on the bow, about seventy-five yards closer to respondent's vessel "B" than the navigator on the bridge of libellant's vessel "A"; but, as a charge of negligence on the part of libellant's vessel "A", the respondent further alleges that several minutes preceding the moment when the lights of respondent's vessel "B" were sighted by the helmsman of the libellant's vessel "A", and notice given by him to the officer in charge of the navigation of the libellant's vessel "A", said officer left the navigating bridge and went into the chart room, and that, during his absence, the management of said vessel was left in the care and charge of seamen who were not licensed officers, and that during the absence of the navigating officer, no licensed officer was on the bridge to assist in maintaining the attentive lookout required of a vessel. This phase of the case will be taken up later by the court in determining what effect this charge will have as affecting the libellant's responsibility for the accident.

*Vessels were on crossing courses:*

In view of the stipulations and admissions of proctors for the respondent vessel "B", there are probably not more than two or three questions of fact to be decided by the court, namely, was this a crossing course and did the libellant lack a competent lookout.

The court finds from the evidence that, in addition to being off her course, and

therefore, charged with all of the consequences attaching thereto, respondent's vessel "B" was on a crossing course directly in the path of libellant's vessel "A", with libellant's vessel "A" on her starboard bow, in direct violation of the starboard side rule, and that, at the time of the collision, libellant's vessel "A" was the privileged vessel and respondent's vessel "B" the burdened vessel. The navigator of the respondent's vessel "B" in his deposition testified as follows (Resp. Ex. A pp. 150–152):

"Q. And when you saw the ("B's") red light on your starboard bow you knew that the courses were crossing. A. That is right. * * *

"Q. And if the vessels were crossing, on crossing courses and the rules apply, your duty would be to go to the right—to pass under the ("A's") stern? A. Yes, sir.

"Q. And if the vessels had been on a parallel, opposite course, and she was ahead of you, your duty would be to go to the right? A. Yes.

"Q. The only situation in which it would be your duty to go to the left, under the rules, would be in the event you saw the green light on your starboard side—showing green to green. A. Yes, if his green light shows to my green light.

"Q. Yes. A. That is right.

"Q. And that situation never existed, did it? A. No, you couldn't see no lights at all on it.

"Q. When you did see any light you know it was never green to green. A. No.

"Q. But the actual effect on your left rudder, as we now know it, was to present your broadside to the ('A'). A. Yes, sir.

"Q. That is correct, isn't it? A. That is right.

"Q. Had you known at the time the report was given which you now know, you would have given a hard right rudder, wouldn't you? A. That is right."

The court is satisfied from a preponderance of the evidence, that there was never a green to green passing situation; that the libellant's vessel "A" saw respondent's vessel "B" on her (libellant vessel "A's") port side, and that the respondent's vessel "B" saw the libellant's vessel "A" on her (respondent vessel "B's") starboard side; in other words, that respondent vessel "B" was to the left of libellant's vessel "A", and libellant's vessel "A" was to the right of respondent's vessel "B"; and, under Article 21 of the International Rules, 28 Stat. 83, Title 33 U.S.C.A. § 106, upon coming in sight of respondent's vessel "B", that libellant's vessel "A" should have gone to the right which she did. The respondent admits in its answer that respondent's vessel "B" directed her course to the left, and it was this fact that threw her broadsides to libellant's vessel "A".

*The starboard side rule:*

■ Under the starboard side rule, when two vessels are crossing so as to involve risk of collision, the vessel which has the other vessel on her own starboard side is the burdened vessel (respondent's vessel "B" in this case) and must keep out of the way of the other vessel, as is required by the rules of navigation. 15 C.J.S., Collision, § 48, pp. 40, 41, and cases cited.

■ The rule adopted by Congress that if two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her starboard side shall keep out of the way of the other, by implication, made it the duty of a vessel which was on the starboard side of another vessel to keep on its course. 13 Stat. 60, 33 U.S.C.A. § 344; The Corsica, 76 U. S. 630, 9 Wall. 630, 19 L.Ed. 804, affirming Fed.Cas.No.3,256, 6 Blatchf. 190, which affirmed Fed.Cas.No.12,495, 37 How.Prac. 262.

"If the steamer which is to keep out of the day of the other wishes to pass to the left she must first obtain the consent of the other (cases cited) and in executing the manœuver she proceeds at her own risk." (Cases cited.) 11 C.J. 1057, n. 12.

"Vessels are approaching on crossing courses, * * * where the red light of the privileged vessel is showing on the starboard hand of the burdened vessel." Note 5[f], p. 1057 and cases cited in 11 C.J. 1057. See, also, 15 C.J.S., Collision, § 48.

The vessel is on a crossing course where the vessel approaching on the starboard side would not actually cross but would strike the other amidships. The Oceanic, D.C., 61 F. 338, affirmed, 9 Cir., 74 F. 261, 20 C.C.A. 419.

The respondent admits the international rules of the road at sea were applicable to both vessels and imposed on the privileged and burdened vessels the correlative duty on the privileged vessel to maintain her course and speed, and on the burdened ves-

sel to keep out of the way of the privileged vessel. The court is satisfied from the evidence that the libellant's vessel "A" scrupulously lived up to this requirement.

Where a collision occurs on the high seas where the International Rules for navigation at sea are applicable, Article 19 of these rules, 26 Stat. 327, Title 33 U.S. C.A. § 104, reads as follows:

"Sec. 104. Steam vessels crossing. * * When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

Article 22 of the rules provides, 30 Stat. 101, Title 33 U.S.C.A. § 207:

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

■ The court is quite satisfied from the evidence that this was a crossing course, and that the respondent's vessel "B" was at fault in its violation. After the collision, the evidence shows that everything was done to mitigate the damages, as was possible under the circumstances, and that both vessels proceeded from the scene of the accident under their own power.

*Proximate cause:*

■■ The proximate cause of any collision must necessarily be determined upon the facts in each case; and, actually and in point of time, the cause of the damage to the two vessels in this case was the collision itself or "the causa sine qua non", which, in turn, resulted from a violation on the part of the respondent's vessel "B" of the starboard side rule, and which in turn resulted from a violation on the part of respondent's vessel "B" of the Port Director's orders at San Francisco. This latter statutory fault, in the court's opinion, was the causa causans (the cause of causes), which set into operation and in a direct line of causation, without a novus actus interveniens, the subsequent causes of the accident, making it the direct and proximate cause thereof, for it is patent that, if there had been no violation of the Port Director's orders at San Francisco by respondent's vessel "B", she would have been on her course to Hueneme and there could not have been any violation of the starboard side rule resulting in the collision. On the other hand, if respondent's vessel "B" had not received any instructions at San Francisco, and had violated the starboard side rule, this violation would have been the causa causans, or the direct and proximate cause of the accident; and, likewise, the violation of the starboard side rule would have been the direct and proximate cause of the accident if there had been a novus actus interveniens (a direct break in the line of causation) between the time the instructions of the Port Director's office at San Francisco had been received and the violation of the starboard side rule, but the court likewise does not believe that there was a direct break in the causal connection or a novus actus interveniens at these points. However, be that as it may, either one of these statutory violations is sufficient to hold the respondent liable for the accident. Certain it is that it was a violation of these instructions that caused the respondent's vessel "B" to go off her course and cross the path of libellant's vessel "A", and the two vessels never would have come into collision with each other if respondent's vessel "B" had kept her course.

"'Proximate cause' has been defined as that which, in a natural and continuous sequence, unbroken by any new cause, produces an event, and without which the event would not have occurred; the efficient cause; the cause that sets another or other causes in operation; the one that necessarily sets the other cause or causes in operation; the efficient cause—the one that necessarily sets the other causes in operation (*the causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, although they may be nearer in time to the result*) that which stands next in causation to the effect—not necessarily in time or space, but in causal relation. The term has also been defined as the active and efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started and working actively from a new and independent source; that which originates and sets in motion the dominating agency that necessarily proceeds through other causes as mere instruments or vehicles in a natural line of causation to a result; that cause which naturally lead to and which might have been expected to produce the result." (Italics supplied.) 50 C.J. 837 et seq.

This violation of two statutory rules by the respondent has thrown upon the re-

spondent the burden of proving "not merely that such disregard might not have been one of the causes of the collision, or even that it probably was not, but that 'it could not have been.'" The H. F. Dimock, supra. And admittedly respondent has not sustained this heavy burden. The wrongful position of the respondent's vessel "B" was not merely a condition of the accident, but a cause, i. e., her statutory violation.

The only way in which this respondent could have shown the inapplicability of the law relative to the violation of these two statutory faults would be to prove that between the times of the violations thereof and the collision, there came into play another novus actus interveniens, so as to break the line of causation therein, and this the respondent has been unable to do; and, in the absence of a novus actus interveniens, or a direct break in the line of causation, as aforesaid, the court must hold that these statutory faults, both or either, were proximately the cause of the accident and that, therefore, the doctrine of in extremis is not available to this respondent.

*Doctrine of in extremis not applicable to respondent:*

It is perfectly obvious by now that the respondent vessel "B" in this case cannot avail herself of the doctrine of in extremis, she having brought about the collision by her statutory faults in that she disregarded the instructions given to her at the Port Director's office in San Francisco, and the Starboard side rule as well. This doctrine of in extremis excuses a vessel for errors in last minute manœuvres only where she is free from any prior fault. The doctrine of in extremis is lucidly stated in 15 C.J.S., Collision, § 155, p. 173, as follows:

"Cause of emergency. Mistakes made by navigators of vessels in imminent peril of collision will ordinarily be attributed to *the prior fault which was the proximate* cause of the collision. (Italics supplied.) The Steel Inventor, C.C.A.N.Y., 43 F.2d 958, certiorari denied Bell v. U. S. Steel Products Co., 51 S.Ct. 344, 283 U.S. 819, 75 L.Ed. 1435—The Clara Mattheu, D.C. Mass., 25 F.2d 123. *Hence if a vessel is to be allowed the defense of in extremis for its errors she must herself be without prior contributing fault.* The M. P. Howlett, C.C.A.Pa., 58 F.2d 923—Royal Mail Steam Packet Co. v. Companhia De Navegacao Lloyd Brasileiro, D.C.N.Y., 50 F.2d 207, affirmed, C.C.A., 55 F.2d 1082, certi-

orari denied Companhia De Navegacao Lloyd Brasileiro v. Royal Mail Steam Packet Co., 53 S.Ct. 11, 287 U.S. 607, 77 L.Ed. 528—The William A. Paine, C.C.A. Ohio, 39 F.2d 586. 11 C.J. p. 1164, note 34. And it must appear that the situation was induced by the fault of the other vessel. The Manchioneal, N.Y., 243 F. 801, 156 C.C.A. 313. 11 C.J. p. 1164, note 35. Therefore if the imminence of the peril or the dangerous contiguity of the two vessels is occasioned by the lack of caution or mismanagement of the vessel committing the error in extremis she will be held responsible for it. [U. S.] Royal Mail Steam Packet Co. v. Companhia De Navegacao Lloyd Brasileiro, D.C.N.Y., 50 F.2d 207, affirmed, C.C.A., 55 F.2d 1082, certiorari denied Companhia De Navegacao Lloyd Brasileiro v. Royal Mail Steam Packet Co., 53 S.Ct. 11, 287 U.S. 607; 77 L.Ed. 528— The William A. Paine, C.C.A.Ohio, 39 F. 2d 586. * * * *In the absence of clear proof that the privileged vessel, then acting in peril of collision, was at fault in failing to avert the collision in spite of the conduct of the wrongdoer, the vessel which took the chance, violated the rule, and created the danger is wholly responsible for the result.* The Fred B. Dalzell, Jr., C.C. A.N.Y. 45 F.2d 580. Moreover any reasonable doubt as to the propriety of a maneuver in an emergency caused by another vessel should be resolved in favor of its propriety. The Hans Maersk, D.C.N.Y., 39 F.2d 98." (Italics supplied.)

Clearly the doctrine of in extremis is not applicable to this respondent.

*Allegation of libellant's negligence:*

Adverting now to the act of negligence charged by the respondent against the libellant's vessel "A" in not having a proper lookout at the time of the collision, respondent alleges in its answer "that several minutes preceding the moment when the respondent's vessel "B's" lights were sighted by the helmsman of the libellant's vessel "A", and notice given by him to the officer in charge of the navigation of the libellant's vessel "A", said officer left the navigating bridge, and went into the chart room. During his absence, the management of said vessel was left in the care and charge of seamen who were not licensed officers. During the absence of the navigating officer, no licensed officer was on the bridge to assist in maintaining the attentive lookout required of a vessel in the situation of the libellant's vessel "A".

This alleged act of negligence is denied by the libellant, and the court finds from the evidence that the navigating officer of libellant's vessel "A" did not leave the bridge and that the chart room of libellant's vessel "A" was immediately back of the wheel and a part of the bridge; furthermore, the evidence shows that the lookout, admittedly on duty at the time of the accident, had been on fishing boats for ten years and a regular seaman on large merchant vessels for five months preceding the collision. During the five hundred yards when the two vessels first became seeable by each other the libellant's vessel "A" had a lookout on the bow, about seventy-five yards closer to respondent's vessel "B" than the navigator on the bridge of the libellant.

According to the libellant's testimony, when the respondent's vessel "B" was first sighted by libellant's vessel "A", both vessels were about two hundred and fifty to three hundred yards apart; and, according to the respondent's testimony, both vessels were about five hundred yards apart when the respondent's vessel "B" first sighted libellant's vessel "A". The testimony is clear that they were travelling about ten knots an hour. Giving the respondent's version of the testimony the benefit of the doubt, the vessels were seen or seeable at five hundred yards distance from each other, or fifteen hundred feet, each travelling at about ten knots or 60,800 feet per hour or 1013 feet per minute, and the combined approach being at the rate of 2026 feet per minute. Therefore, there was an interval of only forty-five seconds between the moment of discovery of libellant's vessel "A" by respondent's vessel "B" at the time of collision; and, if the libellant's version of the accident is correct that both vessels were two hundred and fifty to three hundred yards apart when first seen, the libellant would have had about thirty seconds to avoid the collision. Having in mind the length of these two vessels, the libellant's vessel "A" being 435 feet in length, and the respondent's vessel "B" being 441 feet in length, the court is inclined to the opinion that physical contact between the two vessels during the last forty-five seconds was unavoidable, regardless of what manœuvers could have or actually did take place. This is also the position of the respondent, for it states on page 23 of its opening brief:

"Thus, as the two vessels approached each other, pretty much head and head, it was *essential* that they should see each other and commence to turn at more than twice 258 yards, or a minimum of 516 yards between their bows. If they didn't see each other at a greater distance than 516 yards, and one of them at least began to turn at a greater distance than a minimum of 516 yards between their bows, it was simply a mathematical impossibility to move the mass of either ship out of the lines of approach, and collision was bound to happen."

 Of course, in unavoidable accidents, where each vessel is without prior fault, the court would conclude that the accident was inevitable and exculpate both vessels applying the doctrine of in extremis to each vessel, when each vessel would bear its own damage (The H. Herberman, D.C.N.Y., 33 F.2d 332; The Mary T. Tracy, 2 Cir., 8 F.2d 591, reversing, D.C., 298 F. 528; The Anna C. Minch, 2 Cir., 271 F. 192, affirming, D.C., 260 F. 522; The Djerissa, D.C.Va., 258 F. 949, affirmed The Newa, 4 Cir., 267 F. 115; 11 C.J. p. 1200, notes 5–7; 15 C.J.S., Collision, § 184); but, while the doctrine of in extremis is not applicable to the respondent in this case, it is applicable to the libellant by reason of the fact that there are no prior faults attaching thereto.

 Even assuming that the libellant's vessel "A" did lack a competent lookout at the time of the collision, this fact could not possibly be held to be a contributing factor in this case in view of the admission of proctors for the respondent that the accident was unavoidable when the vessels were five hundred yards apart and the maximum time for manœuvering them out of danger amounted to not over forty-five seconds.

 In The Norfolk, D.C.D.Md., March 14, 1924, 297 F. 251, the summary of this principle of law is as follows:

"Failure of a steamship to keep a careful lookout, or to hear and answer signals from a vessel on a crossing course, held not a contributing cause to a collision between them, where she was the privileged vessel and required by the rules, in the absence of agreement to the contrary, to keep her course and speed, which she did. * * *

"Violation of a statutory rule is such a fault as to throw upon the offending vessel the burden of proving, not merely that it might not have been one of the causes of

collision, or that it probably was not, but that it could not have been." 297 F. at pages 251, 252.

■ There are also cases holding that the absence of a lookout will not be held a contributing factor to the accident where he could not have prevented the accident.

The absence of a proper lookout on a boat, is unimportant, when it has nothing to do with causing the collision. The Farragut, 77 U.S. 334, 10 Wall. 334, 19 L.Ed. 946.

The owners of a vessel whose lookout was known to be negligent are not liable for the consequences of collision to which neglect in maintaining lookout did not contribute—The Annie Lindsley, 104 U.S. 185, 26 L.Ed. 716, affirming, 1873, Fed.Cas.No. 422, 6 Ben. 290.

"A vessel cannot be held in fault for failure to maintain a lookout, where the absence of a lookout in no way contributed to the collision." The George W. Elder, 9 Cir., 1918, 249 F. 956, 162 C.C.A. 154.

"A tug cannot be held liable to contribute to the damages caused by a collision in which her tow was injured, because of her failure to keep a proper lookout, where she was not otherwise in fault, and from the facts shown it appears that the omission in no manner contributed to the collision." The Elk, 3 Cir., 1900, 102 F. 697, 42 C.C.A. 598.

"Fact that lookout is improperly stationed, engaged in other duties, or entirely absent, is not a fault where other vessel is seen or reported as soon as possible *and where a proper lookout would not have availed to prevent collision.*" The Catalina, D.C., 18 F.Supp. 461, affirmed, 2 Cir., 97 F.2d 283. (Italics supplied.)

"It is well settled that the absence of a lookout, or the fact that he was not properly stationed or vigilant, is not material where a proper lookout would not have availed to prevent the collision or minimize the effect." 11 C.J. p. 1124, and cases cited; 15 C.J.S., Collision, § 110.

The court is citing these cases for the purpose of showing that there is a principle of law running through these collision cases that only where a lookout could have prevented a collision will his absence be charged as a fault, and that his absence will not be charged as a fault where his absence did not contribute to the accident.

■ At the time of this collision the lookout in charge of the libellant's vessel "A" was on the job, he had been on fishing boats for ten years and had been a regular seaman on large merchant vessels for five months (libellant's Ex. 2, p. 3) and the court concludes as a matter of law that he was competent; but, in view of the contention of proctor for the respondent that this accident was unavoidable during the last forty-five seconds when the vessels were not more than five hundred yards apart, it is all the more apparent to the court that his presence was in fact unimportant, and his presence or absence, competency or incompetency, could not, because of that fact, have been a contributing factor in the accident and charged as a prior fault. It should be realized that libellant's vessel "A" was the privileged vessel, on her course and without prior fault up to the very moment of collision, and the doctrine of in extremis is necessarily applicable to her and will exonerate her for any damages suffered by the respondent.

*Doctrine of in extremis as applicable to the libellant:*

"Where a navigator, suddenly realizing that a collision is imminent by no fault of his own, in the confusion and excitement of the moment does something which contributes to the collision or omits to do something by which the collision might be avoided, such act or omission is ordinarily considered to be in extremis and the ordinary rules or strict accountability do not apply." 15 C.J.S., Collision, § 155, p. 172, and cases cited.

There is no charge by either side that after the collision the other side was in any way negligent in not minimizing the damages or in offering to render any assistance that might have been necessary to the other vessel.

*Summary and conclusions of the court:*

In conclusion, the court finds as follows: (1) That respondent's vessel "B" was guilty of a statutory fault in violating the instructions of the Port Director's Office in San Francisco to take a certain course to Port Hueneme; (2) that said instructions had the force and effect of a statute; (3) that said vessel was on a crossing course crossing the bow of the libellant's vessel "A" at the time of the collision; (4) that said vessel violated the starboard side rule, which two violations or either of them were the proximate cause of the collision; (5) that the libellant's vessel "A" was the privileged vessel on her course at

all times and cannot be charged with any fault statutory or otherwise; (6) that the libellant's vessel "A" had a competent lookout; (7) that at all times the respondent's vessel "B" was the burdened vessel; (8) that the doctrine of in extremis is not applicable to the respondent's vessel "B" by reason of her prior faults and (9) that the doctrine of in extremis is applicable to libellant's vessel "A" by reason of the fact that she was without fault at the time of the collision.

It is the judgment of this court that the respondent and cross libellant bear the damages sustained to vessel "B", and that the libellant and cross respondent recover from the respondent and cross libellant the full amount of the damages suffered by libellant's vessel "A" as a result of this collision, with costs of suit. This case will be referred to a Commissioner, preferably one who is agreeable to, and recommended by, both sides, for ascertaining the amount of damages to libellant's vessel "A", pursuant to the admiralty rules of this court, and that libellant recover from the respondent the amount of such damages, and costs of suit.

Proctors for the libellant will prepare Findings of Fact and Conclusions of Law and an Interlocutory Decree, in accordance with the Opinion of this court for the signature of the court after having presented same to proctors for the respondent for approval as to form, and within ten days after notice of the court's ruling.